SCHLICHTING (Herman, Sr.), by Conservator, Plaintiff and Respondent, v. SCHLICHTING (Christian A.), Defendant: SCHLICHTING (John F.), Defendant and Appellant.

*November 3—November 28, 1961.*

For the appellant there was a brief by *Rabinovitz & Hodson* of Sheboygan, and oral argument by *Eugene F. Hodson* and *David Rabinovitz*.

For the respondent there was a brief and oral argument by *Lester C. Weisse of* Sheboygan Falls.

CURRIE, J.    The two issues presented by this appeal are:

(1) Is the trial court's finding, that the deed from Herman to Christian was the result of undue influence exerted by John, against the great weight and clear preponderance of the evidence?

(2) Did the trial court commit prejudicial error in admitting evidence alleged to have been improperly received?

Plaintiff Herman was an eighty-four-year-old widower at the time he executed the deed to Christian. He was re-

siding on the homestead tract, a 40-acre farm in Sheboygan county which had been in the Schlichting family for over one hundred years. Residing with him in the home located on such parcel were four unmarried sons, John, Christian, Carl, and Ullrich. There were four other sons, including conservator August, upon whom Herman had settled farmlands when they had married and left home. These settlements were for labor the sons had performed for the father in his farming operations.

Although John is unmarried, he had also received a farm from Herman sometime in the 1940's in settlement for his labor. This farm was located in another part of the county from the home farm. After this settlement, John had left his father's home and lived apart for some years. Later, John sold his farm to his brother August and, about 1953, returned to live with his father.

In 1946, Herman had settled 60 acres of land, which adjoined the homestead forty, on Christian. At least 40 of these 60 acres had originally been purchased by Herman from brothers by the name of Harder. Thereafter, Herman and Christian farmed the remaining 40-acre homestead tract and the 60 acres owned by Christian as equal partners. Partnership income-tax returns, which were prepared by Carl, were filed on this basis. It was verbally understood that Christian owned one half of the personal property on the farm, which included a herd of dairy cattle. Thus, Christian received half of the profits from this farming operation for his labor. The other three sons residing at home with the father worked on the farm and received wages therefor. The partnership's social-security reports indicate that John's wages for the years 1956, 1957, and 1958 were $2,445, $4,300, and $2,700, respectively.

The evidence is undisputed that John handled much of the business affairs of both his aged father and his brother Christian. For example, John collected all the milk checks

for milk produced in the partnership farming operations, deposited them in a Plymouth bank, and made the division between his father and Christian. When Carl made out the partnership income-tax returns, he was forced to depend upon information supplied by John. At the trial, John responded as follows to these questions:

"*Q.* Did your father ask you to help him handle the finances? *A.* At the time I run the farm for him.
"*Q.* When did you run it? *A.* All my lifetime I had authority to run his affairs."

On November 24, 1958, Herman signed a petition addressed to the county court of Sheboygan county in which he requested the appointment of his son August as his conservator pursuant to sec. 319.31, Stats. This petition alleged that Herman then owned real property of the value of $15,000 and personal property of the value of $75,000. It also stated that Herman was of sound mind, but that he did not care to continue managing his own affairs because of his age. This petition was filed with the county court on November 25, 1958, and a hearing thereon was set for December 8, 1958.

The pendency of this conservatorship proceeding worried Herman, and on the morning of December 1, 1958, he discussed with Carl the problem of what should be done with the 40-acre homestead tract. Carl suggested that it be put up for sale at public auction as he was interested in bidding on it. Thereafter, Herman talked to John. The following testimony given by John is rather revealing with respect to what transpired on December 1, 1958:

"The Court: Tell what happened on that day.
"*A.* Then in order, among other things, not to have me and Christian in a hopeless condition, he [Herman] decided to put his house in order and conveyed it to Christian. He didn't feel he was going to sell it to me, that Christian

was the one, and he didn't want to sell to Carl, so it was decided that Christian should have it.

"*Q.* Will you tell what happened prior to the conveyance, how that conveyance came about directly? *A.* Well, he talked to Christian whether he would want to take it on so that his house was in order regardless of what happened.

"*Q.* Were you at that meeting? *A.* Yes. This was in the car. We went out to the field and picked Christian up and talked it over, and then we drove to the lawyer's office, and he signed it over. . . ."

Christian testified that the signing of the conservatorship petition by Herman "brought John to the idea of buying the land." Christian was at work in a field on December 1, 1958, when he was approached by his father and John. Christian's testimony as to what then transpired is as follows:

"*Q.* Your father came down in the field? *A.* Yes.

"*Q.* What did he say to you? *A.* He asked me whether I would buy the farm.

"*Q.* What did you say? *A.* Well, I said I would do it.

"*Q.* Did you have any reasons why you wanted to buy this farm? *A.* Well, no, we never talked about it before. . . .

"Attorney Weisse: You say you bought the land. How much did you pay him for it? How much did you pay him for it in dollars and cents? *A.* I didn't pay him yet.

"*Q.* You never paid him anything? *A.* No.

"*Q.* What price did you agree on when you said he came to the field. How much did you tell him you would pay? *A.* $4,000."

John and Herman then went to the office of a Sheboygan lawyer and Christian remained at home. The lawyer drafted a deed which conveyed the 40-acre homestead tract to Christian. Herman executed this deed and it was recorded after $4.40 of revenue stamps had been affixed. However, defendants' answer, which was verified by John,

alleges that the transfer was a gift to Christian because he had taken care of Herman for the past ten years.

There is no testimony that Christian had done any more in caring for his father than had the other three brothers who were residing in the same household. At the time of this transfer, Christian owned the 60 acres he had received from his father in 1946, and had cash and United States bonds totaling $20,000 to $24,000. John testified that $13,000 of this consisted of a bank account. In addition, Christian apparently owned one half of the personal property employed in the partnership farming operation. Thus, the evidence discloses no reason why Christian should have been given the homestead except as it gives rise to the inference that Christian was a rather weak-minded individual and was favored by his father for that reason.

John testified that after Herman had executed the deed to Christian on December 1, 1958, Herman verbally made Christian a present of the farm personal property and whatever interest he had in the cattle. However, later in John's testimony he was asked why he had sometimes thereafter retained the proceeds from the milk checks. His answer was that the cows were his because Christian had given them to him. John also admitted that Christian's bank account had been placed in the joint names of Christian and John. This testimony, and the fact that John received the homestead tract from Christian by a deed executed December 15, 1958, tend to establish that Christian was completely dominated by John.

John also testified that when Carl learned about the December 1, 1958, deed he became "restless." John's explanation of how the 40 acres came to be deeded to him by Christian is:

"Anyhow Carl was pretty restless about it and getting more so and more so, and then my father said maybe the

farm should come back, and that is when Christian decided to convey it to me. He didn't want to buck the tide."

Christian testified that he went to a lawyer's office on December 15, 1958, which was the day he signed the deed conveying the homestead tract to John. This deed was acknowledged by the same attorney-notary public who acknowledged the December 1, 1958, deed. Christian was asked no questions with respect to the circumstances under which he made the conveyance to John, so the only explanation thereof is that given by John, as quoted above. Revenue stamps in the amount of $4.40 were also affixed to this second deed, but the record is silent on the question of whether Christian received any consideration from John. The only inference we can draw from John's testimony, and from the answer to the complaint, is that this deed was not supported by consideration.

The trial of the instant action did not take place until late in 1960 when Herman was eighty-six years of age. No expert testimony was presented as to his mental condition at that time or at the time when the deed was executed to Christian. However, Herman testified at the trial and thus the learned trial judge was afforded an excellent opportunity to observe his mental condition. The judge in his memorandum opinion made this comment: "[H]is testimony presented a picture of an old man whose memory is failing and who gives some indication of senility." Without any proper objection being interposed thereto, Herman testified at least five different times that he had not intended to convey away the homestead 40 acres. He stated several times that it was always his intention that title to this parcel be retained by him until his death. He also stated that the parcel which he had intended to convey to Christian in 1958 was the 40 acres acquired from Harder brothers, which adjoined the homestead tract.

There were no buildings on the Harder tract; the home and farm buildings were all situated on the homestead forty. Near the close of the trial Herman was again recalled to the stand. He then responded as follows to these questions:

"*Q.* Now look over the copy of the deed, Exhibit 1, dated the first day of December, 1958, between Herman Schlichting, a widower, and Christian Schlichting. That conveys the west half of the east half of the southwest quarter of section 14, township 15 north, range 22 east, containing 40 acres, more or less. Now the testimony here shows that this is the 40 acres that the buildings are on. Do you understand that? *A.* Yes.

"*Q.* Did you understand or want on December 1, 1958, to turn over to Christian this 40 acres with the buildings on it? *A.* No, not myself, but John must have done that. I sold him the forty without buildings."

Apparently, his senility had reached the point where he had no recollection that he had previously conveyed to Christian the parcel purchased from Harder brothers. Furthermore, he was unable to recall any of the details of the December 1, 1958, transaction.

John, in handling Herman's business affairs, stood in a relationship of trust and confidence. Therefore, if the conveyance of the homestead tract without consideration had passed directly from Herman to him, a presumption would exist that the transfer was induced by undue influence. *Kuehn v. Kuehn* (1960), 11 Wis. (2d) 15, 24, 104 N. W. (2d) 138; *Quinn v. Quinn* (1907), 130 Wis. 548, 551, 110 N. W. 488; 24 Am. Jur., Gifts, p. 791, sec. 116. This presumption is one which is confined to *inter vivos* transfers and does not extend to wills. 57 Am. Jur., Wills, p. 280, sec. 389.[1] The effect of the presumption is to place

---

[1] However, in the case of a testamentary disposition to one who stands in a fiduciary relationship to the testator, if such beneficiary has participated actively in the drafting of the will, there is an in-

upon the donee the burden of producing evidence that the gift is free of the taint of undue influence.

In the instant case we deem it immaterial, in so far as invoking this presumption is concerned, that the original transfer was to Christian and not to John. John was the one who stood in the confidential relationship to the father. It was John who accompanied his father out to the field to broach the subject of the transfer to Christian, and he also accompanied his father to the attorney's office where the deed to Christian was drafted and executed. Shortly thereafter, John was conveyed the same property by Christian without consideration. Under these circumstances, John bears the burden of producing evidence that the transfer to Christian was not the result of John's undue influence.

This does not mean that the burden of proof has shifted, as that always rests upon the party seeking to avoid the transfer. However, such party has met this burden when he is able to invoke a presumption of undue influence. But when the party against whom the presumption is invoked adduces some evidence tending to rebut the presumption, what happens to the presumption? Does the presumption then disappear from the case, or does it still remain clothed with the authority of an inference which is to be weighed against the evidence produced which tends to disprove undue influence?

We are of the opinion that there are two types of rebuttable presumptions. One type is invoked by the law for reasons of public policy without regard to whether the presumption thus invoked is likely to bear any reasonable relationship to the actual fact presumed. A typical example of this type is the presumption that a deceased person exercised due care for his own safety. Such a presumption

ference of undue influence. *Will of Faulks* (1945), 246 Wis. 319, 360, 17 N. W. (2d) 423; concurring opinions in *Estate of Barnes* (1961), 14 Wis. (2d) 643, 112 N. W. (2d) 142.

disappears from the case as soon as any evidence is introduced which tends to establish negligence on the part of the deceased. *Callahan v. Van Galder* (1958), 3 Wis. (2d) 654, 657, 89 N. W. (2d) 210; *McCarty v. Weber* (1953), 265 Wis. 70, 73, 60 N. W. (2d) 716.

The other type of presumption is one in which the facts upon which it is based reasonably give rise to an inference of the ultimate conclusion embodied in the presumption. The presumption of undue influence, with which we are here concerned, is of this latter category. For reasons of policy the law has seen fit to clothe such an inference with the authority of a presumption in order to determine the result when no evidence to the contrary is introduced. However, there is no perceivable reason grounded on policy or logic why the inference should not continue after some evidence has come into the case which tends to rebut the presumption. Basing a finding of fact on an inference is nothing more than grounding such a finding on circumstantial evidence. Cf. *Ryan v. Zweck-Wollenberg Co.* (1954), 266 Wis. 630, 647, 64 N. W. (2d) 226.

Professor McCormick recognizes the two classes of presumptions heretofore discussed. McCormick, Evidence (hornbook series), p. 639, sec. 308. Furthermore, in speaking of a presumption grounded upon a reasonable inference, he states that ". . . the inference remains though the 'presumption' has 'disappeared.' " Id., at page 650, sec. 311. Some courts phrase it differently and speak of the necessity of weighing the presumption as evidence. *McDonald v. Hewlett* (1951), 102 Cal. App. (2d) 680, 228 Pac. (2d) 83, 24 A. L. R. (2d) 1281, 1287; *Will of Rogers* (1907), 80 Vt. 259, 67 Atl. 726. Professor Morgan sets forth the manner of properly instructing a jury with respect to a presumption grounded on reasonable inference. Morgan, Instructing the Jury Upon Presumptions and Burden of Proof, 47 Harvard Law Review (1933), 59, 75.

In the instant case, a presumption of undue influence arose from the part which John played in the transaction, the confidential relationship in which John stood to his father, and the advanced age of the father. Christian's testimony with respect to what transpired between himself and his father on December 1, 1958, does have a tendency to rebut the presumption. However, the introduction of such evidence did not remove from the case the inference upon which such presumption was grounded. Therefore, plaintiff father and his conservator were not thereby reduced to the position where, in order to prevail and set aside the conveyance, they were required to adduce further proof of the four constituent elements of undue influence. Without offering further evidence, they were entitled to judgment if the trial court, in weighing the evidence adduced which tended to negative undue influence against the inference of undue influence arising by reason of the presumption, could reasonably conclude that the weight of the evidence was in favor of a finding of undue influence. Implicit in this determination is the fact that the inference is weighed as evidence in favor of a finding of undue influence.

We have no hesitancy in upholding the trial court's finding that the conveyance from Herman to Christian was the result of undue influence exercised by John. The court could reasonably conclude that the evidence adduced to rebut the presumption of undue influence was too weak to overcome the inference embodied in the presumption. Furthermore, in addition to the inference the record contains other evidence tending to establish undue influence beyond that necessary to invoke the presumption.

We turn now to the question of whether the trial court committed prejudicial error, in admitting certain evidence,

which would require reversal and the granting of a new trial.

On this appeal John is represented by different counsel than participated in the trial. The appellate counsel contends that it was prejudicial error to admit into evidence the record of the conservatorship proceedings. When such record was first offered, John's trial counsel entered an objection but then withdrew it. We have examined the conservatorship record and can find nothing in it of a prejudicial nature. It contains no transcript of testimony and neither the petition nor the order appointing the conservator contains any allegation or finding that Herman was incompetent.

The second alleged error in the admission of testimony is that the court permitted conservator August to testify that he heard his father state in the conservatorship proceedings that he still owned the 40-acre homestead tract. No objection was interposed to this, but John's counsel did state: "I suppose the best evidence would be a transcript in county court." After it was explained by opposing counsel that no transcript had been made of anything stated by Herman at the conservatorship proceeding, no further objection was voiced. Furthermore, at the trial Herman testified without objection in substance to the same thing that August testified he had said at the conservatorship proceeding. Therefore, the admission of August's testimony on this point could not have been prejudicial.

Appellant also points to certain hearsay testimony, which got into the record without objection. We have carefully reviewed those cited instances of hearsay evidence and find that almost without exception they merely cover matters which were established by direct evidence not otherwise directly controverted. That is probably the reason why counsel for John interposed no objection. We do not believe that such hearsay testimony played any part in the

ultimate determination of the trial court. It should be noted, however, that hearsay evidence received without objection becomes part of the evidence of the case and may be used as proof to whatever extent it may have rational persuasive power. McCormick, Evidence (hornbook series), p. 126, sec. 54; Anno. 104 A. L. R. 1130.

Subsequent to judgment, defendants John and Christian made a motion for a new trial based largely on the claim that the trial court had admitted improper evidence. By order entered March 13, 1961, this motion was denied. Appellant John attacks this order in his brief. However, the notice of appeal to this court discloses that the appeal is only from the judgment. An appeal from a judgment does not bring before us for review any order entered subsequent to the judgment. *Sicchio v. Alvey* (1960), 10 Wis. (2d) 528, 103 N. W. (2d) 544.

*By the Court.*—Judgment affirmed.