ESTATE OF BARNES: HOVER and others, Contestants and Appellants, v. HORAN, Proponent and Respondent.

*October 6—November 28, 1961.*

For the appellants there was a brief by *Brazeau, Brazeau, Potter & Cole* of Wisconsin Rapids, for Leon Durfey and Vera Durfey, and by *John A. Conant* of Westfield, for Myrtle Marks, and oral argument by *Theo. W. Brazeau.*

For the appellant Elizabeth A. Hover there was a brief by *Chambers & Nash,* attorneys, and *Dudley W. Pierce* of counsel, all of Wisconsin Rapids, and oral argument by *Lloyd L. Chambers.*

For the respondent there was a brief by *Callahan & Arnold* of Columbus, and oral argument by *E. Clark Arnold.*

DIETERICH, J.    The testator, Wellington B. Barnes, died a resident of Adams county, October 11, 1959, at the age of eighty-seven.

The deceased lived on a farm in Adams county for many years with his sister, Mary Barnes. When she died in June, 1952, he succeeded as surviving joint tenant to real estate and securities in the amount of $160,000. In September, 1952, at the age of about eighty, he married for the first time. His wife died in 1956.

Barnes lived at the Oxford Rest Home for about five months from November 30, 1958, until sometime in April, 1959. From April 4, 1959, to October 11, 1959, he made his home with the Lester Garbarski family near Oxford, Wisconsin.

His only surviving heir-at-law is Myrtle Marks, a first cousin.

The record discloses that Barnes had signed six different wills, dated April 28, 1955; July 14, 1956; April 29, 1957; July 18, 1957; May 7, 1958; November 29, 1958; and a codicil dated February 14, 1959. James F. Horan was the scrivener and attorney drafting these wills. He also became, under the terms of the final will and codicil, the principal beneficiary. In the first will, Horan was bequeathed the sum of $12,633; the second, third, and fourth, the sum of $22,633; the fifth, the sum of $32,133; and the sixth, the sum of $46,500. All wills gave him a share of the residue.

While Horan's share of the will increased, others had their shares decreased or eliminated. Mrs. Marks, his cousin who was bequeathed $24,383, plus a share in the residue, was reduced to a total of $500 by the fourth instrument. Mrs. Elizabeth A. Hover, a daughter of a cousin of the testator, was to receive $14,383 under the first will, but was excluded by the sixth will in which Mr. Horan's share increased by $14,367. Leon and Vera Durfey took care of the decedent for six to eight years before his death, were bequeathed $10,000 in the first will and in the second through the sixth instruments were also beneficiaries of a farm valued at $10,000. They were excluded by the codicil to the last will which had the effect of increasing the residue in which Mr. Horan would share. William Anderson, a friend of decedent of forty years, was bequeathed $10,000 in the second, third, and fourth instruments, but was cut to $500 in the fifth instrument of May 7, 1958, which at the same time increased Horan's share by $9,500, the exact difference. Anderson testified that in September, 1959, decedent told him that he would receive "ten grand."

The propounded will is contested by Myrtle Marks, a first cousin of the half blood of the deceased, and by Elizabeth Hover, a first cousin once removed of the deceased.

Leon and Vera Durfey, who are not related to the deceased, filed objections to the codicil. The codicil under date of February 14, 1959, deleted Leon and Vera Durfey as devisees and legatees under the codicil.

The primary issue in this case is whether under the evidentiary facts, the propounded will was duly executed so as to constitute a valid instrument.

The principal contention of the contestants and appellants, based on the testimony of the witnesses to the will and codicil, is that the codicil was read to Mr. Barnes before he signed it, but that the will was neither read to him nor by him prior to the signing.

Edmond Roseberry, one of the witnesses to the sixth and last will drawn by Mr. Horan, at the hearing for proof of the will, testified:

"*Q.* Mr. Roseberry, on the 29th day of November, 1958, was there any conversation between Mr. Horan and Mr. Barnes in reference to the will? *A.* Well, when we went out there to witness, Mr. Horan asked him if this will had been made up the way he wanted it and said, 'Mr. Barnes, is this your last will, etc.,' before he signed it, before we signed it. . . .

"*Q.* Then isn't it a fact that Mr. Horan said to Mr. Barnes in effect this is the way you want it and handed him the will for signature? *A.* Yes, 'Mr. Barnes, is this your last will, etc., I have prepared it the way you wanted it.'

"*Q.* Did Mr. Horan read it to Mr. Barnes? *A.* Not in my presence.

"*Q.* Did Mr. Barnes read it himself? *A.* I don't believe so.

"*Q.* Mr. Barnes just subscribed his signature to it, is that correct? *A.* Yes.

"*Q.* You subscribed your signature to it did you? *A.* Yes.

"*Q.* Did you leave then? *A.* Yes.

"*Q.* I presume Mr. Barnes said good-by and you said good-by and that was the extent of the conversation, is that correct? *A.* Yes, as I recall. . . .

"*Q*. Just prior to the time that Mr. Barnes signed this document which is the will marked Exhibit 2 were any questions asked by Mr. Horan and Mr. Barnes before the document was signed? . . . *A*. He asked Mr. Barnes if this was his last will, if Mr. Horan had made it up the way he wanted it.

"*Q*. What did Mr. Barnes say? *A*. He said it was.

"*Q*. Then what was done? *A*. Then he signed his name to it and then Mr. Hartwig signed, and then I signed."

Norman C. Hartwig, another witness to the sixth and last will, testified as follows:

"*Q*. When you got into the house what took place? *A*. We stood around there and talked. Mr. Horan said he had his will and everything and Mr. Barnes signed it and I signed it and Mr. Roseberry signed it. Before he signed it Mr. Barnes asked, I mean Mr. Horan asked if he was sure if that was the way he wanted it and Mr. Barnes said it was. He never read the will.

"*Q*. You didn't know what was in it? *A*. No.

"*Q*. After that conversation between Mr. Barnes and Mr. Horan then Mr. Barnes signed it, did he? *A*. Yes.

"*Q*. It was after that then that you and Mr. Roseberry signed it? *A*. Yes . . . .

"*Q*. Then tell us what took place? *A*. When I walked into the home?

"*Q*. Yes. *A*. Just like I said, we walked in and we sat down at the table, Mr. Horan explained it to him and everything and he said 'Are you sure, Mr. Barnes' and Mr. Barnes said 'Yes.'

"*Q*. Did Mr. Horan read the will? *A*. No sir.

"*Q*. Did Mr. Barnes read the will? *A*. I don't recall.

"*Q*. You don't remember of his doing so? *A*. No.

"*Q*. Mr. Horan said 'Is this the way you want it Mr. Barnes,' or words to that effect? *A*. Yes, always says 'Are you sure if that is the way you want it' and Mr. Barnes says 'Yes.'

"*Q*. Mr. Barnes then subscribed his signature to the will and you two did? *A*. Yes."

The testimony of Mr. Horan establishes that the will was drawn at Horan's home, brought to Mr. Barnes at his home for execution, and that Horan retained possession of the will after its execution. Thus, Mr. Barnes had no occasion to scrutinize the will except at the time of its execution. However, the testimony reveals that the will was not read by Mr. Barnes or read to him at the time of execution.

The testimony further reveals that for several years before his death, the deceased had been suffering from cataracts, had lost the vision of one eye by an operation, and was no longer able to write, except for signing his name.

That his eyesight was so poor in the years of 1957 and 1958, he could not read a newspaper, except for the headlines. Between November 29, 1958, and February 14, 1959, he had to be led to the dinner table and to the bathroom and could not see television.

Dr. Mackey and Dr. Frederick were the only doctors who examined or treated decedent during the last year of his life.

Dr. J. K. Mackey of Oxford, Wisconsin, testified that when decedent came to him in June, 1958, decedent had fairly well-advanced arteriosclerosis affecting the vision and that his eyesight was very poor.

Dr. Harry Frederick of Westfield, Wisconsin, a physician in practice since 1927, testified that he saw the decedent on April 11, 1959, twice in May, and again in June, 1959. That the decedent was suffering from an advanced stage of arteriosclerosis and senility, and that his eyesight had been seriously impaired since prior to November 30, 1958.

The presumption that a will is valid where duly executed falls where the evidence indicates that the testator did not

know the contents of the instrument at the time of its execution. 94 C. J. S., Wills, p. 906, sec. 130; 95 C. J. S., Wills, p. 273, sec. 384 (3) ; and *Will of Walter* (1885), 64 Wis. 487, 491, 25 N. W. 538. Horan, as attorney for the testator, occupied a fiduciary relationship with the deceased and in addition, as evidenced by the power of attorney, held a confidential relationship with the testator. Horan was also the scrivener of the will and a substantial beneficiary under the terms of the testator's will.

Under these circumstances the proof of formal execution is not enough and it was the duty of the proponent of the will to show actual knowledge by the testator of the contents of the will. There is no testimony that the testator knew the will was drawn in accordance with his directions. The testimony of Roseberry, one of the witnesses to the will, is that Mr. Horan said to Mr. Barnes in effect, "Is this the way you want it," and handed the will to Barnes for signature, but there is no testimony that the testator had any actual knowledge of what the will contained. Such will cannot be admitted to probate as a valid last will and testament because the proponent has not met the burden of proof that it was the testator's last will and testament. This being so, the codicil also fails because the codicil expressly refers to the will of November 29, 1958. See 57 Am. Jur., Wills, p. 574, sec. 864.

*By the Court.*—Judgment reversed, and cause remanded with directions to the county court in probate to dismiss the probate proceedings of the last will and testament of Wellington B. Barnes dated November 29, 1958, and the codicil to the will dated February 14, 1959.

CURRIE, J. (*concurring*). The denial of admission to probate of the instant propounded will and codicil most likely will result in the propounding of the May 7, 1958, will, which also was drafted by Horan for the testator.

Therefore, while the court's opinion herein does not pass on the issue of undue influence, this issue undoubtedly will be raised before the county court if any of the series of wills drafted by Horan, in which he is a beneficiary, are hereafter offered for probate.

As pointed out by Mr. Justice FAIRCHILD in his concurring opinion, if a person standing in a confidential relationship to the testator is named as a legatee in the testator's will, and such beneficiary has also participated in the drafting and execution of the will, an inference of undue influence arises. This rule was laid down in *Will of Faulks* (1945), 246 Wis. 319, 360, 17 N. W. (2d) 423. However, it was not applied in that case because the legatee, who there stood in a confidential relationship to the testator, had not participated in the drafting of the will.

In a recent case, *Estate of Hendricks* (N. D. 1961), 110 N. W. (2d) 417, the North Dakota court had before it a situation where a confidential relationship existed between a chiropractor and an elderly patient, and the former had assisted the latter in carrying on his business affairs. The chiropractor acted as scrivener in drafting a will for the patient whereunder the chiropractor was the principal beneficiary. The court held that the circumstances gave rise to an inference of undue influence and cast upon the proponent of the will the burden of going forward with the evidence to overcome this inference.

Other courts, in stating this rule, have substituted the word "presumption" for "inference." *Belfield v. Coop* (1956), 8 Ill. (2d) 293, 134 N. E. (2d) 249, 58 A. L. R. (2d) 1008; *Will of Rittenhouse* (1955), 19 N. J. 376, 117 Atl. (2d) 401. However, whether the rule be stated in terms of an inference or a presumption makes very little difference from a practical standpoint. This is because this type of presumption is not one which disappears upon the introduction of any evidence that conflicts

with the presumption. The reason for this is explained in *Schlichting v. Schlichting* (1961), 15 Wis. (2d) 147, 112 N. W. (2d) 149.

If the learned trial court had invoked this inference of undue influence in deciding the instant case, it is doubtful if the evidence produced by the proponent would have been found sufficient to outweigh the inference.

The trial court's memorandum opinion clearly indicates that it does not believe that Horan was guilty of any wrongdoing. This may very well be the case. However, he has only himself to blame for acting as scrivener and personally procuring the execution of the will. He thereby put himself in a position where his own lips are sealed by the "dead man's statute," sec. 325.16, and he is prevented thereby from giving testimony on such matters as whether the will was properly explained to testator before execution. It was also this fact of acting as scrivener, coupled with the confidential relationship, which called into being the inference of undue influence. All of this could have been avoided if Horan had recognized the conflict of interest, which existed between his position as attorney and confidential business adviser to the testator, on the one hand, and his role as a principal beneficiary under the will, on the other, and had insisted that a disinterested attorney be called in to draft the will.

I am authorized to state that Mr. Justice HALLOWS joins in this concurring opinion.

FAIRCHILD, J. (*concurring*). There was conflicting testimony upon the subject of Mr. Barnes' mental capacity, and very little testimony tending to prove the elements of undue influence. Judge GOLLMAR prepared a decision in which he meticulously dealt with the material issues. I think it is fair to say that except for two matters, which do not arise in most will-contest cases, the findings of the

county court would not be against the great weight and clear preponderance of the evidence, and would be sustained here.

The first exceptional proposition is testator's understanding of the document propounded as his will. In *Will of Walter* [1] this court said:

"In cases belonging to either class [wills of persons unable to read at all or of persons unable to read the language in which the will was written] the court should require satisfactory proof that the testator was correctly informed of the contents of the instrument he was about to execute."

In that case, the testatrix did not understand English, the language in which the will was written, but proof that she gave directions as to its contents through an interpreter and that the interpreter explained it to her after it was drafted was considered sufficient. Testimony of a disinterested attorney-draftsman was recently held sufficient in a similar case. [2]

In the present case the county court was satisfied that Mr. Barnes' eyesight was quite impaired. There is an additional reason, however, for requiring proof that the testator knew the contents of the instrument.

"There is support for the rule that an instrument cannot be admitted to probate as a valid last will and testament where it was drawn by one named a beneficiary therein to the detriment of the natural heir of the testator, in the absence of evidence, in addition to proof of formal execution, that the testator knew the contents of the instrument, at least where the beneficiary acting as scrivener is bequeathed a substantial legacy, or was in a confidential relationship with the testator. It has been said that where the draftsman of the will takes a large benefit under it, knowledge of the contents of the will by the testator must be shown either by proving that the will was read to him or by him,

[1] (1885), 64 Wis. 487, 492, 25 N. W. 538.
[2] *Estate of Dobrecevich,* ante, p. 82, 109 N. W. (2d) 477.

or that he gave instructions for such a will, or by proving other similar facts." [3]

Judge GOLLMAR indicated in his decision that he gave consideration to the rule stated in *Will of Walter, supra,* and concluded that the testimony of the witnesses to the execution of the will, briefly describing conversation between Mr. Horan and Mr. Barnes to the effect that Mr. Barnes said the will was the way he wanted it, coupled with the fact that the will was within the pattern of previous wills although giving an increased benefit to Mr. Horan and cutting another, was sufficient. In addition to these facts, it appeared that some of the differences between the 1958 will and the next-earlier one had become known to interested parties, possibly through Mr. Barnes. The codicil which was executed February 14, 1959, republished, ratified, and confirmed the will dated November 29, 1958, and was read to Mr. Barnes at the time of execution. Mr. Barnes had mentioned the effect of the codicil to one of the interested parties. While the record certainly does not contain evidence directly establishing that Mr. Barnes knew the contents of the will, either when the will or the codicil was executed, or that it conformed to the instructions he gave to Mr. Horan for drafting it, the circumstantial evidence just referred to was deemed sufficient by the court. With considerable reluctance, born of respect for the opportunity of the trial judge to observe the witnesses and hear the testimony, I join in the conclusion that this evidence was not sufficient.

A second unusual proposition flows from the fact that Mr. Horan, who prepared the will, was in a confidential relationship with the testator and received a substantial bequest under the will, substantially increased indeed over the bequests made to him in previous wills. These facts

---

[3] 57 Am. Jur., Wills, p. 574, sec. 864.

are sufficient to raise an inference that the will was the result of undue influence by the attorney-draftsman.

"Thus, if a lawyer, in drawing a will, drafts himself a bequest, he must explain the circumstances and show that the gift was freely and willingly made; he must, in other words, show that he did not embrace the opportunity of exerting undue influence over the testator." [4]

"Attorneys for clients who intend to leave them or their families a bequest would do well to have the will drawn by some other lawyer. Any suspicion which may arise of improper influence used under the cover of the confidential relationship may thus be avoided. The law, recognizing the delicacy of the situation, requires the lawyer who drafts himself a bequest to explain the circumstances and to show in the first instance that the gift was freely and willingly made. . . . In the absence of any explanation, a jury may be justified in drawing the inference of undue influence, although the burden of proving it never shifts from the contestant." [5]

The present rule in Wisconsin has been stated in *Will of Faulks*: [6]

"The mere existence of a confidential relation between a testator and a beneficiary under his will, such as attorney and client, physician and patient, priest and parishioner, confidential adviser and his advisee, etc., does not of itself constitute undue influence nor cast upon the beneficiary the burden of disproving undue influence. However, the existence of such a relationship may cause a court to scrutinize the evidence more closely and weigh it more carefully. When coupled with other circumstances such as the activity of the beneficiary in procuring the drafting and execution of the will or a sudden or unexplained change in the attitude

---

[4] 5 Am. Jur., Attorneys at Law, p. 290, sec. 51.

[5] *Will of Putnam* (1931), 257 N. Y. 140, 143, 177 N. E. 399, 79 A. L. R. 1423.

[6] (1945), 246 Wis. 319, 360, 17 N. W. (2d) 423.

of the testator or some other somewhat-persuasive circumstance, it gives rise to an inference of undue influence which the proponent has the burden of rebutting."

It would appear from Judge GOLLMAR's decision that he followed the first portion of the rule above quoted, and considered that it was only his duty to "scrutinize the evidence more closely and weigh it more carefully." It is my opinion, however, that where the beneficiary involved is the draftsman of the will and arranges for its execution, as Mr. Horan did here, the latter part of the rule above quoted applies and an inference arose which Mr. Horan had to rebut in order to sustain the will.

Judge GOLLMAR considered a number of facts, including the lack of natural objects of bounty and other persons particularly close to Mr. Barnes, and the judge's own reaction to Mr. Horan's actions as indicating "an honest, but perhaps not too judicious handling of the situation." Even if the evidence sufficiently showed Mr. Barnes' understanding of the will at the time of execution, it could well be said that the evidence tending to disprove undue influence was not sufficient to counterbalance the inference arising from the confidential relationship. If the matter were disposed of on grounds of undue influence, the question would also arise whether the entire will would fall, or only those parts which make gifts to Horan.

As has been noted, the situation as to the codicil is somewhat different from the will, both as to execution and as to the interest of the draftsman, although the revocation of certain gifts by the codicil would tend to increase the residue of which Mr. Horan was given a share. In any event, however, the codicil simply revokes a devise and a bequest, and confers certain administrative power upon the executor and cannot stand alone as a will.

I am authorized to state that Mr. Justice HALLOWS joins in this opinion.