ESTATE OF FORD: LAUTERJUNG and another, Objectors and Appellants, v. FORD, Executor, Respondent.

*March 4—April 2, 1963.*

For the appellants there were briefs by *Schloemer & Merriam* of West Bend, and oral argument by *C. J. Schloemer.*

For the respondent there was a brief and oral argument by *Henry P. Hughes* of Oshkosh.

CURRIE, J.   No question is raised on this appeal with respect to the due execution of the propounded will. Thus the only issue before us is whether the trial court's finding that this will was not the result of any undue influence is against the great weight and clear preponderance of the evidence.

Decedent, a bachelor, had been totally blind for some years before his death in his eighties. For approximately ten years prior to June, 1960, decedent resided with his widowed sister, Eleanor Lauterjung (hereinafter "Eleanor") in Chicago. In May, 1960, Eleanor become seriously ill and was taken to a hospital. Mrs. Alsfasser, a close friend of Eleanor, called at her apartment and found decedent there alone. Thereafter Mrs. Alsfasser came to the apartment daily, until after Eleanor's death on June 2, 1960, to prepare decedent's evening meals. Eleanor's son and daughter, the two objectors to the will, also stayed there nights during their mother's last illness. Robert Lauterjung then lived in Chicago, and Marita Davey resided at Ames, Iowa.

One evening while Mrs. Alsfasser was preparing decedent's dinner, John Enright, a Chicago attorney, came to the Lauterjung apartment. Robert Lauterjung and Marita Davey were present as was Mrs. Alsfasser because Mrs. Davey had earlier been unsuccessful in prevailing upon her to leave before Enright arrived. Enright stated to decedent that he had drafted a will for him, to which decedent remarked, "You what?" Enright repeated that he had drafted a will for decedent, and decedent stated, "I want to tell you, whatever your name is, if I want to make a will out I will get my own lawyer." Enright then excused himself but left the draft of will with decedent.

This unexecuted will bequeathed decedent's estate in equal shares to his sisters, Mary Ochner and Eleanor Lauterjung,

and to his brother, Charles M. Ford, with the further provision that, if any of the three legatees should predecease testator, his or her share would pass to his or her descendants per stirpes. No mention was made of the four California nieces. There is a strong inference that either Robert Lauterjung or Marita Davey, or both of them, requested Enright to draft this will because there can be no doubt that decedent did not authorize him to do so.

Mrs. Alsfasser testified that Robert Lauterjung and his wife resided in the same apartment building in which Eleanor lived, but that decedent "didn't get along so well with Bob [Robert Lauterjung]; he thought Bob was a spendthrift." Mrs. Alsfasser never saw Charles visit decedent at Eleanor's apartment, but one day, while Eleanor was in the hospital, decedent remarked that he would like to see Charles. Eleanor had told Mrs. Alsfasser that decedent and Charles did not get along together, so that from time to time she would meet Charles away from her apartment.

Mrs. Alsfasser further testified that when Eleanor "was practically dying," decedent said, "They are trying to railroad me to a Home," apparently referring to Eleanor's two children, Robert and Marita. On this occasion decedent also begged Robert and Marita to permit him to stay in the apartment until Eleanor died and promised to pay the apartment rent for June if they would grant his request. This request was apparently refused because on May 31, 1960, two days before Eleanor died, decedent went to live at the Alexian Brothers Hospital at Oshkosh, Wisconsin, taking his personal effects with him.

Charles visited decedent at the hospital about the middle of June. Decedent said he did not like it there and wished to return to Chicago. Upon Charles' return to Chicago, he rented a room there for decedent in a convalescent home and made a $20 deposit for the rent on June 16th. Nevertheless, decedent never returned to Chicago because in the meantime he had come to like living at the hospital.

Charles testified that it was on this first visit to decedent at Oshkosh that decedent gave Charles directions for drafting a will. On Charles' return to Chicago, he went to see his lawyer, Nathan Wolfberg, and had him draw the will that is the subject of this litigation. When Wolfberg turned the draft of will over to Charles, he also delivered to Charles sheets containing typed instructions with respect to the proper execution and witnessing of the will. Among the instructions were these:

"Need 3 witnesses—prefer nurses and a doctor.
"Then have the nurse or doctor read the will aloud to Mr. James Ford in the presence of all 3 witnesses.
"Then ask Mr. Ford if this is his will."

Charles brought the will and instructions to Oshkosh on June 28th. One of the brothers of the Order which operated the hospital then telephoned Attorney William Gengler of Oshkosh and informed him that a patient had need of the services of a notary public in connection with a will to be executed. Gengler went to the hospital and met Charles and decedent in the latter's room. The will and instruction sheets prepared by Wolfberg were shown to Gengler. After Gengler mentioned that he was a lawyer as well as a notary public, he was asked for an opinion with respect to the instructions. Gengler told them that the instructions were well put and that they should follow them. Gengler then excused himself.

Thereafter, one of the brothers of the Order called Dr. Reuben H. Bitter, an Oshkosh physician engaged in the general practice of medicine. After Dr. Bitter arrived, he was introduced to decedent and furnished with one of the instruction sheets prepared by Wolfberg. The doctor questioned decedent in order to determine his mental condition. This questioning related to current events, the will, and decedent himself, and Dr. Bitter concluded that decedent's

mental condition was very good. Two lay hospital assistants, Larsen and Gens, were called in to act as witnesses to the will. Charles also remained in the room throughout.

Dr. Bitter then read each of the provisions of the will to decedent and after each asked him if that was what he wanted. Decedent replied each time, "That's the way I want it," except once when he asked, "Charles, is that all right with you?" and Charles replied "Yes." After the will had thus been read and approved by decedent, he signed it while seated at a table, and Dr. Bitter, Larsen, and Gens signed as subscribing witnesses. Decedent kept the executed will in a tin box in his suitcase until his death.

On several occasions after June 28th, Gengler saw decedent at the hospital in connection with certain legal work he was doing for decedent. On these occasions decedent told Gengler, in effect, that "they were robbing him blind" and stealing his homestead acreage in North Dakota, without identifying to whom the word "they" referred. Decedent told Gengler that Charles had given him this information. Decedent and Gengler also discussed litigation pending in Chicago although there is no evidence that any action was ever commenced against decedent.

Decedent had Gengler go to Chicago to investigate the probate records in the Eleanor Lauterjung estate to ascertain whether that estate was laying claim to decedent's farm in North Dakota. Gengler found nothing in the estate file to indicate such a claim. Decedent drew a check for $10 for Gengler on a bank at Hettinger, North Dakota, where decedent kept his checking account, in order to determine whether anyone had tied up this account by legal process. The check cleared without incident.

Decedent also showed Gengler a warranty deed dated August 27, 1956, whereby decedent had placed title to a quarter section of land in Adams county, North Dakota,

in the names of Eleanor Lauterjung and himself as joint tenants. Gengler then procured a certified copy of this deed from the local register of deeds of the county in which the land was located to check for possible alterations in the deed as recorded. He found none and concluded that by reason of Eleanor's prior death decedent became the sole owner by right of survivorship. Gengler met Charles on three or four occasions while doing this legal work. At Charles' instigation, decedent discharged Gengler after each such meeting but, after each discharge, decedent again engaged Gengler's services.

One of the matters on which decedent consulted Gengler was the advisability of decedent's signing a written authorization, which Charles had submitted to decedent, to permit Charles to make withdrawals from decedent's bank account. Gengler advised decedent not to sign this authorization. On one occasion, decedent stated to Gengler that Charles was anxious to control decedent's estate and that, "He [Charles] is going to control it after I am dead, but not before." After the failure of these attempts by Charles to take over the management of decedent's property, he then petitioned the county court of Winnebago county sometime in September, 1960, to appoint a guardian for decedent. This greatly upset decedent, and he engaged Gengler's services to contest the guardianship. He also discussed the making of a new will with Gengler but died without doing so. His death occurred prior to the hearing on the guardianship petition.

Decedent also confided in Brother Hugh Miller (hereinafter "Brother Hugh"), in addition to Gengler, with respect to Charles' statements to decedent about litigation in Chicago between the Eleanor Lauterjung estate and decedent, and the attempt by the estate to claim his North Dakota land. Brother Hugh, a registered nurse, was a member of the

Order which operated the hospital. He had first become acquainted with decedent some years before while stationed at another hospital of the Order at Signal Mountain, Tennessee, where decedent had been a patient. Decedent apparently liked Brother Hugh and frequently talked with him during the time decedent was in the hospital at Oshkosh.

Brother Hugh testified that every time Charles would visit decedent, the latter would become greatly upset to the point that his health was harmed. On one occasion decedent told Brother Hugh that he had worried all night because of information Charles had given him. Nevertheless, all of decedent's statements to Brother Hugh about information Charles had given him about relatives suing him, or trying to obtain his property, occurred after June 28th, the date he signed his will.

Decedent told both Gengler and Brother Hugh that he had signed a will. Brother Hugh saw the envelope containing the will in the tin box in decedent's room in which he kept his securities and valuable papers. Decedent never mentioned his nieces in California to Brother Hugh but frequently talked about his deceased sister Eleanor. Both Brother Hugh and Mrs. Alsfasser testified that decedent was a strong-minded individual who was not susceptible to influence by others.

During the period from June 1, 1960, until decedent's death on October 20, 1960, there is no record of any lawsuit having been commenced against him by anyone. Nevertheless, on September 16, 1960, Gustav E. Beerly, Jr., administrator *c. t. a.* of the estate of Eleanor Lauterjung, deceased, filed an inventory in that estate with the clerk of the probate court of Cook county, Illinois. This inventory listed as an asset of the estate "title in fee" to the lands owned by decedent in Adams county, North Dakota, and an "Unliquidated claim against James F. Ford for room and board and nursing services from the period of May of 1950, to

June of 1960, at $200 per month." Although Charles testified as a witness he was not asked about his source of information, prior to the filing of this inventory, that the Eleanor Lauterjung estate was claiming title to the North Dakota real estate and claiming that decedent owed the estate for ten years' board, room, and nursing care supplied to him by Eleanor.

Having recounted in considerable detail the material evidence adduced in this will-contest proceeding, we now turn our attention to application of the governing principles of law to the facts here presented. The four essential elements which must be established in order to void a will for undue influence are: Opportunity to exercise undue influence; disposition to exercise undue influence; susceptibility of the testator to undue influence by the person having such opportunity and disposition; and a result indicating the exercise of undue influence by such person. *Will of Ehlke* (1943), 244 Wis. 115, 121, 11 N. W. (2d) 497. Nevertheless, this court has frequently commented on the fact that in most cases proof of undue influence may, and usually does, rest solely upon circumstantial evidence. *Estate of Larsen* (1959), 7 Wis. (2d) 263, 269, 96 N. W. (2d) 489; *Will of Ehlke, supra,* at page 121; and *Will of Leisch* (1936), 221 Wis. 641, 648, 267 N. W. 268. Furthermore it was stated in *Estate of Larsen, supra,* at pages 269, 270:

"Concomitant with the rule, that circumstantial evidence is sufficient to prove undue influence, is the further rule that, where three of the elements required to show undue influence are clearly established, only slight additional evidence as to the fourth element is necessary to compel the inference of its existence. *Will of Lee* (1946), 249 Wis. 59, 64, 23 N. W. (2d) 405; *Will of Stanley* (1937), 226 Wis. 354, 357, 276 N. W. 353; *Will of Walker* (1927), 193 Wis. 264, 271, 213 N. W. 626; and *Elliott v. Fisk* (1916), 162 Wis. 249, 253, 155 N. W. 110."

There can be no question but that Charles had ample opportunity to exercise undue influence upon decedent. Furthermore, the record discloses that he did not hesitate to importune decedent to take over the management of his property after he moved to the Alexian Brothers Hospital in Oshkosh. While this evidence establishes a disposition in Charles to exercise influence, his importunity did not constitute undue influence. Nevertheless, Charles also selected his own lawyer, with whom decedent had no contact, to draft decedent's will. Had such efforts to obtain control of decedent's property been coupled with a will so favorable to Charles as to cause it to be an unnatural one for decedent to make, such facts might well have provided sufficient circumstantial evidence upon which to sustain a finding that Charles was disposed to exercise undue influence over decedent.[1]

Even though the evidence clearly establishes that decedent was a strong-minded individual, who successfully resisted Charles' importunities to take over the management of his property, there is, nevertheless, evidence that Charles exerted another type of influence over decedent. This took the form of statements that persons connected with the Eleanor Lauterjung estate, presumably the two objectors, were making a claim against decedent, claiming his North Dakota realty, and commencing litigation with respect thereto. If

[1] Had Charles stood in a fiduciary relationship to decedent at the time he undertook to procure the drafting of the will, this fiduciary relationship, together with his active participation in the drafting of the will and the fact that he was one of the two principal beneficiaries under the will, would have raised an inference of undue influence and placed upon him, as proponent, the burden of going forward with the evidence. *Will of Faulks* (1945), 246 Wis. 319, 360, 17 N. W. (2d) 423; concurring opinions in *Estate of Barnes* (1961), 14 Wis. (2d) 643, 650, 651, 652, 655, 656, 112 N. W. (2d) 142; and *Schlichting v. Schlichting* (1961), 15 Wis. (2d) 147, 155, footnote 1, 112 N. W. (2d) 149.

these statements were intentionally false, they would tend to prove a disposition on Charles' part to exercise undue influence over decedent because such statements would be closely connected in time with the execution of his will on June 28th, even though made shortly thereafter.

Although the making of false statements to injure those who might be the natural objects of testator's bounty may not constitute undue influence, because the free agency of testator is not thereby destroyed, nevertheless, such statements may constitute such fraud as will nullify the will. *Estate of Newhall* (1923), 190 Cal. 709, 214 Pac. 231, 28 A. L. R. 778; 57 Am. Jur., Wills, p. 265, sec. 362; and Anno. 92 A. L. R. 790, 793. Furthermore, decedent was susceptible to this type of influence because he believed Charles' statements and repeated them to Gengler and Brother Hugh as being true.

Nevertheless, except for the fact that no litigation against decedent had been commenced, the gist of these statements may very well have been true. It seems highly improbable that the administrator's listing of the North Dakota realty and the claim for board, room, and nursing care in the inventory of the Eleanor Lauterjung estate was done without some preliminary discussion of the matter with Eleanor's two children, the objectors. Charles may well have been privy to some of this discussion. If litigation against decedent had been threatened, we would deem immaterial the inaccuracy of Charles' statements to decedent that litigation had actually been commenced. Charles, as the proponent of decedent's will, did not have the burden to establish the truth of these statements; rather, the burden was on the objectors to prove them false.

Objectors have failed to establish that the disposition of estate made by the will constituted an unnatural or unjust result. Except for the $5 bequests to his nephew, Robert

Lauterjung, and his nieces, decedent divided his estate equally between Charles and Mary, his sister, the only surviving members of his family. There is no evidence of any association between the four nieces in California and decedent. The objectors, the two children of decedent's sister Eleanor, did not testify or adduce any evidence to indicate any reason why decedent should have been inclined to leave them any substantial part of his estate. Mrs. Alsfasser's testimony provides an explanation why decedent would not be likely to do so. It is to be reasonably inferred from her testimony that the objectors refused decedent's request that he be permitted to remain in their mother's apartment until she died. Furthermore, it is inconceivable that the objectors did not have something to do with the listing as assets of their mother's estate both decedent's North Dakota realty and a claim against decedent for board, room, and nursing care. This action suggests that relations between the objectors and decedent were strained rather than friendly.

The objectors contend that the trial court first found that the will was procured by undue influence but, nevertheless, admitted the will to probate. This contention is based upon the following paragraph in the trial court's memorandum decision:

"It would appear from the outset that the instrument presented for probate was clearly the work of Charles Ford, the brother of James, and that it was procured by undue influence used upon James Ford by his brother. It would appear that all of the elements required to prove undue influence existed in this particular case. This conclusion could be reached from the fact that Charles Ford was the messenger, that the scrivener was not the one chosen by the testator and that the contents of the will were so disproportionate and so favorable to Charles Ford that no other conclusion could be reached. In reviewing the testimony, however, this first impression is overcome as to the circumstances of the execu-

tion, the mental characteristic of the testator, and the expiration of time that existed between the date of execution and the date of death of the testator, he remaining conscious until just a few hours before his death."

We do not interpret the above-quoted paragraph to constitute an actual finding of undue influence. Our interpretation is that the trial judge merely stated both his first impression, that the will was the result of undue influence, and his reasons for this first impression. Then the trial court made the statement that this first impression was dispelled by the other evidence mentioned in the concluding sentence. Thus there was no actual finding made of undue influence.

One facet of this paragraph from the memorandum decision deserves further comment. This is the reference made to the lapse of time between the date of execution of the will and decedent's death and to the further fact that decedent remained conscious until a few hours before his death. If a will is void because procured by undue influence, it cannot be ratified by testator's subsequent conduct so as to become valid. Nevertheless, subsequent conduct of the testator might be relevant on the issue of whether the will actually was the result of undue influence. If the claimed undue influence took the form of inducing testator to make a testamentary disposition that he did not wish to make, his subsequent conduct in not changing the will, although familiar with its contents, would tend to disprove that the disposition of estate was the result of undue influence. On the other hand, if the claimed undue influence took the form of false statements made against certain heirs to induce testator not to bequeath any part of his estate to them, the subsequent conduct of the testator in failing to change his will would be irrelevant unless it was further established that testator learned of the falsity of the statements.

Without giving any weight to testator's conduct occurring after he made the will, namely, his taking no steps to change

such will, we conclude that the trial court's finding that the will was not procured by undue influence is well supported by the evidence. Therefore, the judgment must be affirmed.

*By the Court.*—Judgment affirmed.

WILKIE, J., took no part.