Estate of Perssion: Curkeet, Guardian *ad litem,* Appellant, v. Eisenberg, Proponent, Respondent.

*September 3—October 1, 1963.*

For the appellant there was a brief and oral argument by *William R. Curkeet, Jr.,* of Madison.

For the respondent there was a brief by *Walstead, Anderson, Bylsma & Eisenberg* of Madison, and oral argument by *Clarence G. Bylsma.*

HALLOWS, J. The appellant makes several contentions but they are all related to the question of undue influence. It should be needless to state the rule, but we will, that the trial court's findings on questions of fact will not be upset on appeal unless they are so wrong as to be against the great weight and clear preponderance of the evidence; likewise, the rule that undue influence whether in a contest involving a will or *inter vivos* conveyances must be proven by clear, satisfactory, and convincing evidence. See a discussion of the cases in *Kuehn v. Kuehn* (1960), 11 Wis. (2d) 15, 104 N. W. (2d) 138. Also of ancient origin are the four elements necessary to be proven to sustain the charge of undue influence.[1] "Stated in capsule form these are: Susceptibility, opportunity to influence, disposition to influence, and coveted result. Stated more completely: 1. A person who is susceptible of being unduly influenced by the person charged with exercising undue influence; 2. the opportunity of the

[1] *Will of Ball* (1913), 153 Wis. 27, 141 N. W. 8; *Estate of Fillar* (1960), 10 Wis. (2d) 141, 102 N. W. (2d) 210; *Estate of Dobrecevich* (1961), 14 Wis. (2d) 82, 109 N. W. (2d) 477; *Estate of Spenner* (1962), 17 Wis. (2d) 645, 117 N. W. (2d) 641; *Estate of Ford* (1963), 19 Wis. (2d) 436, 120 N. W. (2d) 647.

person charged to exercise such influence on the susceptible person to procure the improper favor; 3. a disposition on the part of the party charged, to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another; 4. a result caused by, or the effect of such undue influence." *Will of Freitag* (1960), 9 Wis. (2d) 315, 317, 101 N. W. (2d) 108.

Perssion was a talented musician but was primarily engaged in the business of owning and operating real estate in the city of Madison. For some time before his death he was diabetic and suffered from headaches; and on the day before he executed his will he was ill. Perssion engaged in many real-estate projects, either personally or through a corporation. It was characteristic of him to overextend his finances and to be in need of money but he was always able to borrow from his friends and relatives to meet most of his current obligations. At the time of his death he was indebted to Philip J. Eisenberg, the husband of the sole beneficiary, in the sum of $40,000 on a cognovit note which became due October 14, 1961. This money was borrowed to enable Perssion to complete a building which was then under construction and inadequately financed. While the note was executed by P and C, Incorporated, of which at that time Perssion was at least the majority stockholder, the note was indorsed personally by Perssion. The note was uncollateralized by the corporation, but Philip J. Eisenberg received 40 percent of the stock of the corporation for loaning the money and the note provided upon default the lender could acquire the stock which Perssion personally had pledged for the loan. Perssion and Donald S. Eisenberg were officers of the corporation. Perssion borrowed from his brother and from his sister Beatrice P. Eisenberg. The

members of the Perssion family were extremely close and many favors were done where no compensation was either expected or paid.

The relationship between Perssion and his wife was estranged and distant, and on several occasions Mr. Perssion told others he wanted a divorce and wanted to cut his wife out of his will. There is no doubt that Perssion loved his daughter and did everything a father would normally do for an offspring. He was greatly interested in her musical education and wanted her to go to college. The daughter was married on May 11, 1961, unknown to her father and mother. Upon learning of the marriage in August, Perssion was deeply hurt. Prior to the marriage Mr. Catherwood had been in Madison only a few times and was only slightly known to Perssion. However, after the marriage Perssion continued to treat his daughter as he always had, still wanted her to go to college, bought her an expensive violin, and outwardly at least showed no lack of love and affection toward her although there had always existed a lack of free communication between them.

After the execution of the will and before Perssion's death, both the wife and the daughter saw a copy of the will at the home of the testator. This was discovered by Mrs. Perssion among other papers Mr. Perssion had kept at home. Both of them thought the will was a joke. However, Mrs. Perssion mentioned the will to her husband stating she did not think he would ever do such a thing. Mr. Perssion made no response and the matter was dropped. A claim of $25,000 on behalf of Mrs. Eisenberg was filed in the estate, and for the purpose of the issue here involved it was admitted that she was not going to be able to prove it.

It is not necessary to break down the totality of the evidence which includes other facts by an analysis and allocation to each element necessary to be proven to establish undue influence. In many cases one or more of the elements gain

or lose strength by such process and affect in a mathematical sense the certitude the trier of the facts must have to make a finding on undue influence.

The appeal of the appellant's position is strongest in the apparent unnaturalness of the will and in the opportunity to exercise undue influence; but more dispositive is the inference of undue influence which arises from the fact that the attorney, who was a son of the sole beneficiary, drafted and supervised the execution of the will. Unrebutted, such showing makes a *prima facie* case. The two concurring opinions in the *Estate of Barnes* (1961), 14 Wis. (2d) 643, 112 N. W. (2d) 142, pointed out the rule announced in *Will of Faulks* (1945), 246 Wis. 319, 17 N. W. (2d) 423, that if a person standing in a confidential relationship to the testator participates in the drafting and execution of the will is named a beneficiary therein, an inference of undue influence arises. The rule was not applied in either *Faulks* or in *Barnes*—the latter case turned on a different point. The rule was applied in an attorney-draftsman-beneficiary case in the *Estate of Spenner* (1962), *supra,* wherein this court held the inference was overcome by evidence which established the result accomplished by the will, which was not unnatural, produced no special benefit for the attorney as distinguished from the benefits given members of the same class, *i.e.,* cousins, and by the absence of any showing of actual influence to be included as a member of the class.

Here, the attorney is not designated a beneficiary in the will but his mother is the sole legatee. Should the same inference arise? In *Schlichting v. Schlichting* (1961), 15 Wis. (2d) 147, 112 N. W. (2d) 149, this court held an inference of undue influence arose when a son, standing in a confidential relationship with his father, procured a conveyance of land to another son, and shortly thereafter took title to the land from his brother without consideration. True, *Schlichting* is not controlling; but if a benefit in some form

is probably to be received by the attorney-draftsman by reason of a substantial bequest to the beneficiary, the inference ought to arise. Human nature and the experience of mankind justify such inference. This court has pointed out many times the difficulty of proving undue influence because the acts of influence may be as varied as human conduct and the proof thereof must generally rest on circumstantial evidence. The inference so rests. Where one does not stand in a confidential relationship with the testator he may likewise in fact exercise undue influence for the purpose of procuring a benefit for another. The concept of undue influence is not limited to obtaining a direct benefit for one's self. We hold, therefore, an inference of undue influence arises in a situation where the beneficiary is a member of the family of the attorney preparing and drafting the will for his client or the attorney is a member of the beneficiary's family, as in this case. The propriety of a lawyer drafting and supervising such a will is discussed in *State v. Horan* (1963), 21 Wis. (2d) 66, 123 N. W. (2d) 488, decided this day.

It is unnecessary to consider the appellant's argument the court erred in sustaining the objection to a question put to the witness Beatrice Eisenberg concerning the terms of her will relating to her children. Donald Eisenberg knew the terms of his mother's will. A favorable answer to the appellant would have strengthened the inference of undue influence but if the court committed error, it was not prejudicial because no evidence was introduced to rebut the inference on that score.

The inference, and the additional evidence in support thereof, which the appellant contends independently is sufficient to sustain a finding of undue influence, is overcome by other evidence the trial court considered more persuasive. This case turns on the question of whether the testator was susceptible of being unduly influenced by either Beatrice

or Donald Eisenberg. All humanity is susceptible to influence—that is the nature of man. But all influence is not wrong or undue; it is often quite good. "Influence becomes undue when it commands or compels the exercise of volition on the part of the person subject to such influence so that the result is the accomplishment of the will or purpose of the one using influence rather than, in fact, the will or purpose of the donor. The nature of the influence is in the form of mental persuasion or compulsion but not necessarily fear, which is the element of duress. The degree of persuasion which is unfair depends on a variety of circumstances. Both permissible influence and undue influence may induce a transaction. The distinction is whether the result was produced by influencing a freely exercised and competent judgment or by dominating the mind or emotions of the person susceptible to the influence." *Kuehn v. Kuehn* (1960), 11 Wis. (2d) 15, 24, 104 N. W. (2d) 138.

The evidence is meager that Mrs. Eisenberg could unduly influence her brother. On occasions she told him to dress more respectably, take a bath, and change his residence. Whether he did is not clear from the record. Perhaps in some respects she was the more dominant of the two, but there is no direct evidence she influenced him in his business or dominated him to make the will although the testator was very close to her, doing innumerable favors, and also seeking financial help from her, her husband, and her son. Perssion was an intelligent, alert, and stubborn man. As the widow testified, he was "pretty independent; " his daughter, that he "was a stubborn man; " and his business associate Stephan J. Caravello, that he was "very stubborn" and "did things pretty much his own way without consulting people." The evidence indicates a man intensely desirous of making money, working long hours every day, and having the characteristic of hanging on tenaciously to every asset he ac-

quired. Witness Caravello testified the decedent thought his nephew was immature and was too young and the testator did not listen to or follow his nephew's advice on many matters. The witness thought Mr. Eisenberg could not completely control the testator. The evidence produced by proponent of the will portrays a man at odds with his wife for many years, who stated to his business associate he wanted to divorce her and was going to leave her out of his will, and one who was deeply hurt by the secret marriage of his daughter. The will was not made in haste or while in an infirmed or enfeebled condition. Mr. Perssion was only fifty-two when he executed the will and no question is raised of his testamentary capacity to make a will. The testator knew what he did and knew his wife knew, but he took no steps to change his will although the opportunity existed. No court has equitable powers to remake his will because it appears on its face to be unjust. *Will of Rice* (1912), 150 Wis. 401, 136 N. W. 956; *Will of Ball, supra; Estate of Weaver* (1926), 191 Wis. 431, 211 N. W. 130.

The main thrust of the appellant's evidence centers around the theory the testator, by his nature and his economic dependence upon Donald Eisenberg's and his family's mercy, was susceptible to financial pressure. The Eisenberg family were creditors to the extent of $85,000 to $90,000 and it was within the power of Philip Eisenberg to foreclose the testator from his corporation and to take over the testator's stock. Perssion was in financial difficulties and two months before executing the will had suffered financially by an underinsured fire to one of his buildings. The loss upset him. This evidence has probative value but fell short of clear, satisfactory, and convincing proof in the opinion of the trial court that the testator was susceptible to undue influence by the Eisenbergs. The finding is not contrary to the great weight and clear preponderance of the evidence.

We do not find sufficient basis in the evidence that the Eisenbergs conspired to procure a will favorable to themselves or that the will constituted security for the Eisenbergs' loans. Nor is the argument sound that the testator had no intent to make this instrument a will. This argument is grounded upon the statement of Donald Eisenberg to the widow shortly after the death of the testator that if the testator had lived he would have changed the will. Assuming the truth of this statement, the evidence does not show a lack of proper testamentary intent. The intention to constitute an instrument the will of the maker consists of his desire and intention that the writing be his will if he should die before he revokes it or modifies it by a codicil. In the experience of mankind a will is frequently made with the thought that in the future it may be changed to fit new conditions and circumstances but for the present it is what the maker wants and intends. But life to many people is only the present and unfortunately death often terminates the present too soon.

*By the Court.*—Order affirmed.

Wilkie, J., took no part.