ESTATE OF MILBROT (Marjorie) : MILBROT (Vernon), Appellant, v. PERSHA, Respondent.*

*No. 283. Argued May 9, 1969.—Decided June 3, 1969.*
(Also reported in 168 N. W. 2d 129.)

* Motion for rehearing denied, with costs, on September 8, 1969.

For the appellant there were briefs by *Lueck & Skup-niewitz* of Beaver Dam, and oral argument by *A. W. Lueck*.

For the respondent there was a brief by *Strub, Woodworth & O'Connell* of Beaver Dam, and oral argument by *Ernest Strub*.

WILKIE, J. The two issues to be resolved on this appeal are whether: (1) Marjorie Milbrot was mentally competent to execute her will; and (2) the execution of her will was procured by undue influence exerted upon her by Nickolas J. Persha.

Marjorie Milbrot was forty-two years old when she died and had never married. In 1946 she met Nickolas Persha at a dance at the Firemen's Hall at Hustisford, Wisconsin. Thereafter, Nickolas accompanied her to various other dances around the area and took her to a number of eating places. The record reveals very little about the relationship, if any, between Nickolas and Marjorie after these events until the year 1964. In October of 1964 Marjorie purchased a 120-acre farm known as the Westphal farm. Prior to the purchase of that farm, Mrs. Westphal suggested that Marjorie have Nickolas take a look at the farm since he would be working it. The next day Nickolas and Marjorie looked at the farm together.

After the farm was purchased, Marjorie and Nickolas moved into the first floor of the farmhouse where they lived together until Marjorie's death in 1967. Tenants occupied the second floor. Nickolas owned a 200-acre farm a few miles from Marjorie's farm.

Nickolas testified that there was no financial arrangement between himself and Marjorie with respect to working her farm. He stated that he "just worked it along with mine for free." However, the record does reveal that in 1965, 1966, and 1967, both Marjorie and Nickolas made growing contracts with the Baker Canning Company for crops grown on Marjorie's farm. These contracts were signed by both Marjorie and Nickolas, except for the 1967 contract which was signed by Nickolas alone. Nickolas testified at the hearing that he signed that growing contract on the insistence of his fieldman, so that the sweet corn waste could be hauled to Nickolas' personal farm.

Nickolas testified that the payments for these crops from the Baker Canning Company were made by checks payable to both himself and Marjorie. He testified that only one check was delivered to him personally and that was in 1968, following Marjorie's death, when he received a check for approximately $24.65, which he cashed.

The testimony of Attorney Robert E. Storck reveals that on April 3, 1967, testatrix came to his office to sign her income tax return. At that time he suggested that it would be a good idea for her to make a will. After some discussion she decided to do so. The will was drafted and signed at that time.

Attorney Storck testified that Marjorie told him that she did not intend to leave anything to her brother because he had been adequately provided for in the will of their father. She also indicated concern because her brother had been drinking quite a bit. She stated that she wished to leave her estate to Nickolas Persha because

he was her "closest friend," and they planned to be married. The will was so drafted, giving the reason for excluding Vernon Milbrot. After reading the first draft, Marjorie inquired of Attorney Storck what would happen if Nickolas died first. This matter was discussed and she decided that the will should be changed to include a contingency clause naming as contingent beneficiary the Beaver Dam Hospital, Long-Term Unit.

Nickolas testified that he did not know until April 4, 1967, that Marjorie had made a will. He also stated that he did not know the contents of her will.

Nickolas testified that arrangements had been made for Marjorie and himself to be married in 1961. He also stated that there were plans for a marriage ceremony to be performed the last weekend in July, 1967. He testified that he had purchased an engagement ring in 1950 at the jewelry store in Mayville.

Hilda Schwantes, a resident of Mayville for fifty-six years, testified as to her visit with Marjorie in April of 1967. At that time Mrs. Schwantes asked why Marjorie had not called on her to make her wedding dress. At that time Marjorie said that she could not marry Nickolas because she had promised her father that she would not marry Nickolas because he was a Catholic and of a different nationality. Mrs. Schwantes stated that Marjorie cried bitterly but claimed that she could not break her promise to her father.

The record also reveals that the relationship between Marjorie and her brother Vernon, appellant herein, was not particularly close. Attorney Storck testified generally to this effect. Specifically, he testified that he had prepared a notice of termination of tenancy for Vernon Milbrot which Vernon served on Marjorie in September of 1964. She had been residing on a farm owned by Vernon. Shortly thereafter she purchased the Westphal farm.

## Undue Influence.

The objector's principal attack on the will of Marjorie Milbrot is that she was under the undue influence of Nickolas J. Persha at the time of its execution. The legal principles governing the resolution of this matter are well settled.[1] The four elements of undue influence, which must be proved by clear and convincing evidence, are:

". . . Opportunity to exercise undue influence; disposition to exercise undue influence; susceptibility of the testator [testatrix] to undue influence by the person having such opportunity and disposition; and a result indicating the exercise of undue influence by such person."[2]

In most cases, proof of undue influence rests upon circumstantial evidence.[3]

The sole question before this court on the issue of undue influence is whether the findings of the trial court are against the great weight and clear preponderance of the evidence. The fact that there may be facts in the record which could support contrary findings is not enough for reversal.[4]

It appears that there is ample evidence in the record to support the findings of the trial court with respect to the elements of undue influence.

As to the element of susceptibility, the trial court found that "Marjorie Milbrot had a mind of her own and did things her own way and was a little stubborn and made

---

[1] *Will of Cooper* (1965), 28 Wis. 2d 391, 137 N. W. 2d 93; *Estate of Perssion* (1963), 20 Wis. 2d 537, 123 N. W. 2d 465; *Kuehn v. Kuehn* (1960), 11 Wis. 2d 15, 104 N. W. 2d 138; *Estate of Fillar* (1960), 10 Wis. 2d 141, 102 N. W. 2d 210; *Will of Freitag* (1960), 9 Wis. 2d 315, 101 N. W. 2d 108.

[2] *Estate of Ford* (1963), 19 Wis. 2d 436, 445, 120 N. W. 2d 647.

[3] *Id. See* cases cited.

[4] *Will of Freitag, supra,* footnote 1, cases cited at page 317.

up her own mind at all times material herein." It concluded that "Marjorie Milbrot, at all material times, and on April 3, 1967, was not susceptible to undue influence." The court noted that, while she listened to the people at the Baker Canning Company with respect to stock transfers, the Westphals, her minister and her lawyer, and most of the witnesses stated that she did things in her own way, was a little stubborn, and made up her own mind.

Mrs. Hugo Borchardt, who had known Marjorie all of her life, testified that she was:

". . . perhaps a little cautious and self-sufficient and if I might use the word, stubborn to the point that she did as she wished and a lot of times we girls asked her to go along and she would prefer to do what she wanted to do; she was quite self-willed."

John Gitzinger, president of the Commercial Bank of Iron Ridge, testified that Marjorie was the kind of person who "followed your advice because she . . . had confidence in you." He stated that she would not always follow that advice and "she had a mind of her own." He also testified that "she was a good business woman and agreeable and able to handle her affairs as she saw fit."

The record also reveals that Marjorie dealt with the Baker Canning Company in making a $65,000 settlement on her stock; that she dealt with her insurance agent in 1966 and had him change her life insurance beneficiary from her brother to her estate; and that she purchased a number of automobiles and a farm.

The trial court's specific finding and conclusion that Marjorie Milbrot was not susceptible to undue influence are clearly not against the great weight and clear preponderance of the evidence.

The court further found that Nickolas J. Persha "did not have any desire or disposition to exercise undue influence" over Marjorie. The record indicates, as the trial court notes in its memorandum opinion, that Nickolas and Marjorie had known each other for many years

—"going back into the 1950's." The testimony of Mrs. Schwantes indicated that there was affection between them but that they had not married because of Marjorie's promise to her father. The court also noted that there was an open offer to marry which was never withdrawn by Nickolas.

In its memorandum opinion the trial court stated as follows:

"Without going over it all, I will suggest that none of the witnesses called by the objector, including the objector and his wife offered anything which indicated a bitterness toward Nick or shock because of their living together. The witnesses from the community seemed to accept them as a couple. I find nothing to indicate that Nick was anything but considerate and affectionate and helpful toward the decedent. From her point of view the will she made was completely natural. The law speaks of influence that results from endearing acts. A child who gives his life to the care of his parents is not thereby exercising 'undue' influence. The influence that Nick had over Marjorie, if he exercised any at all, was the kind of influence that arises in response to affection, kindness, helpfulness and sincere appreciation. This does not make the will 'unnatural' from Marjorie's point of view or from that of any objective observer."

Accordingly, the trial court found:

"That, from the point of view of Marjorie Milbrot, the will she made on April 3, 1967, was completely natural, in giving her property to Nickolas J. Persha, with the provision that, in case Nickolas J. Persha predeceased her, her entire estate would go to Lutheran Hospital, Beaver Dam, Wisconsin, with no provision, in either case, for her brother, Vernon Milbrot."

Appellant specifically attacks two of the trial court's findings.

Finding 11 reads as follows:

"That the people from the community in which Nickolas J. Persha and Marjorie Milbrot lived seemed to accept them as a couple."

Appellant contends that there is not one word in the record to support this finding. Respondent points out that none of the witnesses, including the objector, criticized Marjorie and Nickolas for living with each other. In fact, Mrs. Westphal stated that her husband suggested that before buying the farm Marjorie should have Nick look over the farm because he would be working it. This evidence is enough to show that the finding made by the court is not against the great weight and clear preponderance of the evidence.

Finding 13 reads as follows:

"That the will of April 3, 1967, was not the result of undue influence exercised by Nickolas J. Persha over her on April 3, 1967, or at any other time, *but rather it resulted from his kindness, consideration, help and support over many years.*" (Emphasis added.)

Appellant challenges the italicized portion of this finding. It is suggested that there is no evidence to support this finding. Again we find this contention is without merit. In addition to the fact that the record is replete with evidence of his kindness and consideration to her shown by his taking her to dances, eating places, offering to marry her, the record establishes beyond contradiction that Nickolas worked on the farm for Marjorie, he looked over the Westphal farm before she purchased it, and he went with her to the Baker Canning Company office when her crop was poor. He took her to the hospital a few days before she died. The trial court's finding was not contrary to the great weight and clear preponderance of the evidence.

Although the trial court noted that the element of opportunity was met because Nickolas lived with Marjorie, this has no significance because the other elements were negated by the trial court's findings.

## *Competency.*

The testimony of Attorney Robert E. Storck (who drafted the will) and his secretary, Gloria Ann Beck, as well as other testimony in the record as to Marjorie's mental condition at the time the will was executed and thereafter, clearly supports the trial court's finding:

"That the instrument, dated April 3, 1967, propounded as the Last Will and Testament of Marjorie Milbrot, deceased, was executed in the manner and form required by law, and Marjorie Milbrot had testamentary capacity to make her will, and she was over the age of twenty-one years, being in her early forties."

and its statement in the trial court's memorandum opinion:

". . . As to her competency, there is a multitude of testimony as to her conduct from which it is clear that Marjorie was competent in the legal sense right up until the day of her death."

The objector's attempt to show mental incapacity at the time this will was made involved offered testimony by the doctor (Dr. Michael Bachhuber) who made certain observations during his treatment of Marjorie; actual testimony by Dr. William Richards, who conducted an autopsy of Marjorie on the day of her death; and offered testimony by Dr. Henry Suckle, who had made a report based on Dr. Richards' report. We do not reach the merits of the extent to which their testimony, as given or offered, is admissible since at most it would not support a finding of mental incapacity to make the will at the crucial time.

Under an offer of proof, Dr. Michael Bachhuber would have testified:

". . . That she was a highly nervous person. That she was many times mentally confused. That she was very

much over weight for a person of her size and age. One other point, that she dressed very poorly and many times in slacks and in slacks many times unbecoming to her."

Dr. William Richards' actual testimony as to his autopsy concluded as follows:

". . . (1) this patient expired, the cause of death, severe atherosclerosis of the coronary arteries with heart failure secondary to damage of the myocardium. (2) The patient had signs of severe deficiency of the thyroid gland."

As to Dr. Henry Suckle, an offer of proof was made and denied that,

". . . based upon what Dr. Richards said this morning, . . . [his] findings . . . without a doubt, would indicate an individual suffering with hypothyroidism with mixed edematous degeneration and severe atherosclerosis and hypertension; that these would undoubtedly have been present when she made the will on April 3, 1967."

The findings of the trial court as to the capacity of testatrix to make the will are definitely not against the great weight and clear preponderance of the evidence.

Concluding, it should be noted that the testimony is uncontradicted that Marjorie was overweight at the date the will was signed. There was much dispute at the trial, in the briefs, and on oral argument and even subsequently about certain photographs that show Marjorie in 1946 and in 1965, as to whether they were admitted or relevant to this controversy. We have considered them as part of the record on the appeal and they add nothing to the substance of objector's position.

*By the Court.*—Order affirmed.