WILL OF KALICICKI: KELESKE (Joseph), Appellant, v. KELESKE (Paul), Executor, Respondent.

*November 30, 1966—January 3, 1967.*

For the appellant there were briefs and oral argument by *Adrian P. Schoone* of Racine.

For the respondent there was a brief by *Foley, Capwell, Foley & Kolbe,* and oral argument by *John W. Foley* and *Garth R. Seehawer,* all of Racine.

HALLOWS, J.   The appeal raises three contentions: (1) The conveyances of two pieces of real estate were unconditional gifts, (2) credit should have been given for partial repayments of the loans, and (3) no interest should have been charged on any of the loans and value of the real estate. Joseph Keleske claims a new trial should be granted in the interest of justice; but we think not, because a reversal for further proceedings can correct the errors we conclude were committed.

For clarification, we point out that Joseph and Paul Keleske changed their name from Kalicicki. This dispute between the brothers arose after their mother's death because of Joseph Keleske's position that she died without leaving any estate and he did not have in his possession any property of his mother or owe her any money.

Josephine Kalicicki and her first husband Stanislau emigrated to the United States from Poland around 1890, settling in Racine, and during their lives had 12 children, but only Paul, Joseph, and Stanley Keleske survived to adulthood. They were thrifty people and when Mr. Kalicicki died in 1938 had accumulated their homestead, a tavern property, 450 shares of stock in the Wisconsin Screw Company which was operated by Stanley and Paul, and other assets. Joseph had been provided with a college education and was a pharmacist.

In 1941 or 1942 Mrs. Kalicicki married Isadore Salamon and about that time made her will, which remained unchanged at the time of her death, in which she gave $1,000 to Paul and to Stanley and divided the balance of her estate between the three sons.

Stanley Keleske died in 1946 and Paul Keleske sold the screw company and paid off the stockholders. His mother received $13,950 for her shares. Paul then moved from Milwaukee to Florida. Mrs. Kalicicki and Joseph Keleske continued to live in Racine, where Mrs. Kalicicki died in 1963.

Joseph Keleske argues the evidence does not support the court's finding he obtained the conveyances of the tavern property and the homestead from his mother by undue influence, and the imposition of the constructive trust by the court was based on a contract made in 1950 which could not vary the terms of the antecedent unconditional gifts.

The record shows that in 1939, within ten months after his father's death, Joseph Keleske had the tavern property conveyed to him by his mother without consideration. It is claimed he paid his mother the rents from the tavern until he sold it in 1958. Around 1950 the homestead was deeded to Joseph Keleske and his wife Mildred. Shortly thereafter an unwitnessed agreement was signed by the decedent, Joseph, and his wife, which acknowledged the prior conveyances of the tavern and the homestead; and provided: (1) If Josephine Kalicicki died while the properties were held by Joseph and his wife, they were to keep the properties as their own, (2) that if Joseph should predecease his mother, the properties would be reconveyed, (3) the properties could be mortgaged and the proceeds used for investments to the personal use of Joseph Keleske, and (4) Joseph Keleske and his wife were not to be responsible or liable in any way to his mother or her heirs or assigns during the time they had title to the properties. Joseph Keleske testified he did not

know who drafted the agreement; it was signed in his mother's home and he did not receive a copy. His wife testified she did not read or discuss the agreement before signing it.

One of the issues stipulated before trial was whether the transfers of this real property were gifts or in trust for the decedent, or attempted testamentary dispositions, and this agreement of 1950 could be introduced in evidence. Thus in referring to this curious agreement, the trial court noted that if it was intended as a testamentary disposition it was invalid for want of proper execution. We think Joseph Keleske's argument that the court used this agreement to impose a constructive trust upon unconditional transfers is not well taken or founded in the evidence. As we view the opinion of the trial court, it considered the document as not inconsistent with and in fact of some supporting value of the theory of undue influence.

We will not recount all the evidence which supports an inference of undue influence. It is without dispute and in fact admitted that Joseph Keleske stood in a confidential relationship with his mother who was sixty-six years of age at the time she conveyed the tavern. While she was apparently in good health and worked as a midwife, shopped and went to church, nevertheless she could only read a little English, generally spoke Polish and relied on Joseph Keleske in handling her business affairs to the extent she signed documents without attempting to read them. The conveyance of these two properties under such circumstances raises an inference of undue influence sufficient, if accepted by the trier of the facts, to sustain a verdict. *Schlichting v. Schlichting* (1961), 15 Wis. (2d) 147, 112 N. W. (2d) 149; *Kuehn v. Kuehn* (1960), 11 Wis. (2d) 15, 104 N. W. (2d) 138. Of the four elements necessary to prove undue influence, *Estate of Perssion* (1963), 20 Wis. (2d) 537, 538, 539, 123 N. W. (2d) 465, there is no question that Joseph Keleske

had ample opportunity to influence his mother and the result indicated the exercise of undue influence by Joseph Keleske. At the time of his father's death, his mother was, for her station in life, financially independent, yet at the time of her death he claimed she had no estate. He claims his mother was not susceptible to undue influence but the fact she looked to him and trusted him as her business manager is sufficient. And, undue influence does not exclude conduct which borders deceit. The trial court found Joseph Keleske had a disposition to influence his mother and characterized him as a greedy and grasping man who was not above lying when he thought it would best serve his interest. He had a long record of cheating when it helped him financially. The record does not show the trial court was in error in its appraisal of Joseph Keleske.

It was difficult for the trial court to believe his testimony on this and other issues. The record showed that in 1926 Joseph Keleske was convicted of bootlegging; in 1935 he was convicted on two counts of possessing intoxicating liquor with intent to sell without affixing tax stamps; in 1941 he was convicted of selling intoxicating liquors after closing hours, and in 1944 of selling liquor to a minor. In 1962, only a year before his mother's death, he surrendered his license to practice pharmacy after selling drugs without a prescription and admitting he forged a physician's signature on a prescription. He admitted knowingly falsifying deductions on his income-tax returns and was required to pay $26,000 or $27,000 additional taxes and penalties and, upon his mother's death, Joseph Keleske attempted to charge his brother Paul Keleske for scrubbing out and cleaning his mother's home which at the same time he claimed belonged to himself. During this time he managed to acquire ownership of some 60 pieces of real estate.

While the court found a constructive trust as a remedial device, we do not think this was error or even necessary to the recovery of the value of the property on the ground

of undue influence. In fact, the judgment is in the form of a common-law judgment to recover money and not a typical decree in equity ordering the defendant to transfer specific property. Joseph sold the tavern in 1958 and the homestead a few months after Mrs. Kalicicki's death. A constructive trust does not depend upon the intent of the parties but is a device of equity to afford effective relief involving specific property. *Masino v. Sechrest* (1954), 268 Wis. 101, 110, 66 N. W. (2d) 740; *Estate of Massouras* (1962), 16 Wis. (2d) 304, 312, 114 N. W. (2d) 449. In this case the parcels of real estate were not in the possession of Joseph Keleske nor were the proceeds from their sale identified.

In this second argument, Joseph Keleske claims the evidence was sufficient to prove the repayment of part of the loans. He does not argue there was error in the court's finding loans were made totaling $22,219.50, but claims that he made repayments in excess of $13,700. Exhibit 11 consists of receipts bearing the decedent's signature representing $4,400 purportedly paid to her by Joseph Keleske between January, 1947, and September, 1949. He testified he wrote these receipts and had his mother sign them. Exhibit 10 was a pack of cancelled checks by which Joseph Keleske allegedly repaid $6,340 between January, 1950, and May, 1958. Joseph Keleske testified after his mother endorsed these checks he would either give her cash in return for the check, or take the check to the bank for her, cash it and give his mother the cash. The credibility of Joseph Keleske was for the trial court to determine in the first instance and it did not believe he paid his mother the money when he had her endorse the checks and sign the receipts or that she realized what she was signing. Under the circumstances we do not think this written evidence of payment is entitled to the recognition accorded documentary evidence of repayment where such evidence is not tainted as it was in the instant case. *Davenport v. Schram* (1859), 9 Wis. 114 (*119) ; *Breitenbach v. Gerlach* (1965), 27 Wis. (2d)

358, 134 N. W. (2d) 400; 40 Am. Jur., Payment, pp. 898–900, secs. 287, 288; and 70 C. J. S., Payment, p. 301, sec. 93b. We think the probative value of the receipts and checks was impeached and Joseph Keleske was under the burden to show by credible evidence his mother actually received the money in addition to her signature on the receipts and checks. As to these alleged payments, his proof failed.

As to proof of other payments, Joseph Keleske introduced disbursement statements from the Lawrence Brill Agency in Racine which made investments as Joseph Keleske's agent. George Brill testified his agency mailed monthly checks to Mrs. Kalicicki which were drawn on Joseph Keleske's account with his agency as an accommodation to him. These payments were reflected on Brill's books, but the actual cancelled checks had been destroyed by the agency after a lapse of five years. We think it was error for the trial court not to credit the loans with these payments which amounted to $2,960. We do not consider the incredibility and untrustworthiness of Joseph Keleske to impeach the testimony of George Brill. If these payments were obtained from Mrs. Kalicicki by Joseph Keleske when he delivered some of the checks, the record does not show it.

The last question is whether no interest, simple interest, or compound interest should be charged. While Joseph Keleske argued in the trial court and here that there was no agreement with his mother to pay interest on the loans, his testimony need not be believed. The existence of any loans was initially denied by him, and now the claim of truthfulness is like the cry of "Wolf! Wolf!"

The presumption in the business world, founded upon justice and equity, is that the use of money normally calls for the payment of interest. The development of interest as damages for the detention of property or for tort liability was well considered in *Laycock v. Parker* (1899), 103 Wis. 161, 79 N. W. 327. In undue-influence

cases, even those resulting in loans rather than recoverable gifts, the payment of interest for the use of the money is as equitable, if not more so, as in a commercial transaction, because in undue-influence situations it is hardly possible to contract for interest. Not to require interest is to allow the wrongdoer to keep the fruit while only requiring the return of the tree. This applies to the tavern property and the homestead as well as the loans. *Estate of Keske* (1962), 18 Wis. (2d) 47, 51, 117 N. W. (2d) 575. Joseph Keleske relies on *Ehrlich v. Brucker* (1904), 121 Wis. 495, 99 N. W. 213, but this case is not in point, resting as it does on lack of contract in a commercial transaction involving contracts.

Besides there was some testimony the decedent understood she was to receive interest, at least on the $13,950 loan. The income-tax returns of Joseph Keleske show he took interest deductions from 1947 to 1955 for payments to his mother and his mother's tax returns, which he made out for those years, indicate interest income. We think all loans and the value of real estate should bear at least simple interest.

The trial court allowed compound interest on the loan of $13,950 on the ground the obtaining of this money was a fraud or flagrant breach of trust, and compared Joseph's position to that of a guardian. The general rule applicable to a fiduciary calls for simple interest for breaches of duty except those characterized by fraud or a wilful breach, gross negligence or a violation of a primary duty and in such cases compound interest may be charged against the fiduciary. *In re Thurston* (1883), 57 Wis. 104, 15 N. W. 126; *Taylor v. Hill* (1894), 87 Wis. 669, 58 N. W. 1055. See also Anno. Guardian—Liability for Interest, 72 A. L. R. (2d) 757, 799, sec. 9 (b). However, we do not believe the exception is applicable to this loan even if the analogy to a guardian-ward relationship is proper. It is true, Joseph Keleske obtained this money, which his mother received from the sale of her Wisconsin Screw Company stock, by misrepresenting to her that he

needed it to repair his drug store, when in fact he gave it to the Brill Agency for investment purposes. But a misstatement of the purpose of the loan does not necessarily justify in equity the imposition of compound rather than simple interest. In addition, Joseph Keleske was not a fiduciary in the technical sense of the word, but stood in a confidential relationship to his mother and in that capacity secured this loan so far as the record shows. We think simple interest should be charged and the petition for review denied.

The judgment must be reversed and the case sent back to the trial court for a redetermination on the record of the balance due on the loans, after giving credit for repayments totaling $2,960 and for a recomputation of simple interest on all money due the estate.

*By the Court.*—Judgment reversed, and the cause remanded with instructions to credit the loans with repayments in the amount of $2,960, to recompute the interest on the balance of the loans at five percent simple interest, and to enter judgment accordingly; the appellant to have costs on appeal.