STATE of Oklahoma ex rel. Robert H. HENRY, Attorney General, and American Association of Retired Persons, Appellants,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, Appellee/Cross–Appellant,

and

the Corporation Commission of the State of Oklahoma, Appellee/Cross–Appellee.

No. 74194.

Supreme Court of Oklahoma.

Dec. 24, 1991.

As Modified on Denial of Rehearing March 2, 1992.

Robert H. Henry, Atty. Gen., Robert A. Butkin and Alice S. Mitchell, Asst. Attys. Gen., Oklahoma City, for appellant, State.

Eric R. King, King & King, P.C., Edmond, for appellant, American Ass'n of Retired Persons.

Glen A. Glass and George M. Makohin, Oklahoma City, for appellee/cross-appellant, Southwestern Bell Telephone Co.

Lindil C. Fowler, Maribeth D. Snapp and Lu Willis, Oklahoma City, for appellee/cross-appellee, Corp. Com'n.

OPALA, Chief Justice.

The issues to be resolved in this appeal are: (1) Does American Association of Retired Persons (AARP) have standing to seek corrective relief from the order tendered for review? (2) Is a public service corporation, *i.e.*, Southwestern Bell Telephone Company (SWB), required by law to refund to its ratepayers surplus cash generated by a tax law change? (3) In determining the sum of surplus cash accumulated by SWB, may the Corporation Commission (Commission) include accrued interest? (4) Was it error for the Commission to direct SWB to apply the surplus cash toward upgrading the multi-party line areas of the state to single-party line service? (5) Is the decision to upgrade central offices supported by substantial evidence? (6) Did the Commission impermissibly enlarge its inquiry into the effects of federal tax law changes upon Oklahoma public utilities by also considering evidence of changes in SWB's business operations? (7) If not, (a) Is the Commission's finding that

a depreciation reserve deficiency[1] exists supported by substantial evidence? (b) Does SWB's failure to produce certain audit-related information afford the Commission legally sufficient grounds to exclude severance pay expense from SWB's revenue requirements? (c) In calculating SWB's "cash working capital"[2] was it error for the Commission to exclude "local service revenues billed in advance?" and (d) Must the Commission have attributed interest to SWB's excess deferred income taxes?[3] We answer questions 1, 3 and 7(c) in the affirmative and questions 2, 4, 5, 6 and 7(a), (b) and (d) in the negative.

## I.

### THE CRITICAL FACTS IN LITIGATION

In October of 1986 the Director of the Corporation Commission's Public Utility Division, Howard W. Motley, Jr., initiated proceedings to "inquir[e] into the effect of the 1986 Tax Reform Act on Oklahoma utilities."[4] Twelve companies, including Southwestern Bell Telephone Company (SWB), were named as respondents[5] and ordered to participate in a "technical conference" with the Commission's staff (Staff) for the purpose of "establish[ing] the scope of the information required to determine the effect of the Tax Act."[6]

According to the appellate record, the proceeding's next stage began on June 12, 1987, when notice was given to SWB and to "all interested parties" of a "hearing on the rates of Southwestern Bell Telephone Company" to be held on June 23, 1987. On the latter date, Staff and SWB stipulated in writing that if the Commission, after taking into account "all known and measurable changes" in SWB's business, determines a reduction in the utility's rates to be warranted, the reduced rates would become effective July 1, 1987, the effective date of the Tax Reform Act of 1986. The Commission approved the stipulation.[7]

At the June 23, 1987 hearing the accounting manager for the Commission's Public Utility Division testified that "the 1986 Tax Reform Act reduced the corporate income tax rate from 46% to 34% ... which equates to a 40% income tax rate for 1987 and a 34% tax rate prospectively to flow to the customers of Oklahoma." The case was then assigned to a hearing officer for the express purpose of "taking evidence, hearing and reporting thereon to the Commission." The hearing, which was initially set for December 7, 1987, came to be postponed many times because several parties had intervened, including one of the appellants, American Association of Retired Persons (AARP). It eventually took place on January 26, 27, 30 and February 3, 1989.

---

1. According to the Commission's order "[a] depreciation reserve deficiency arises when depreciation rates previously established for plant and equipment become inadequate due to technological or physical obsolescence of the plant and equipment." The potential impact of a depreciation reserve deficiency upon rates is discussed in Part VIII of this opinion.

2. The concept of "cash working capital" is explained in Part X of this opinion.

3. Part XI of this opinion deals with the question regarding interest on "excess deferred income taxes."

4. See 26 U.S.C. § 11(b)(1)(C), *infra* note 17.

5. The other respondents named in the proceeding were Arkansas Louisiana Gas Company, Arkansas Oklahoma Gas Corporation, Empire District Electric Company, General Telephone Company of the Southwest, KPL Gas Service Company, Lone Star Gas Company, Oklahoma

Gas & Electric Company, Oklahoma Natural Gas Company, Public Service Company of Oklahoma, Southern Union Gas Company, and Southwestern Public Service Company.

6. According to director Motley's application, three other matters were slated for consideration at the technical conference: 1) the "timing for providing ... information for quantification and regulatory treatment, 2) the "unrecorded tax liabilities which have been disclosed for financial reporting purposes but not addressed from a regulatory standpoint" and 3) "the treatment of the tax rate change on deferred taxes related to non-depreciation items." *This opinion does not address itself to any of these considerations.*

7. The Commission expressly found the terms of the stipulation between SWB and Staff to be "fair, reasonable and equitable."

A myriad of witnesses testified on behalf of the State, SWB, AARP and Staff. In addition to live testimony, several parties offered "pre-filed testimony," which consists of written responses to questions prepared in advance of the hearing. These statements, most of which are accompanied by supporting documentation, were introduced and admitted as exhibits. After the hearing each party tendered its own proposed findings of fact and conclusions of law. The hearing officer adopted Staff's recommendations *in toto.*

Based upon its own assessment of the evidence adduced at the hearing, the Commission adopted nearly all of the findings made by the hearing officer. The Commission findings which are pertinent to the issues tendered in this appeal are: (1) the Tax Reform Act of 1986 reduced the federal corporate income tax rate from 46% to 34% and caused SWB to accumulate $30,-677,167.00 in surplus cash between January 1, 1987 and September 30, 1989, (2) "Staff appropriately considered [other] known and measurable changes in SWB's business operations in Oklahoma, (3) a $180 million deficiency exists in SWB's depreciation reserve, (4) Staff was correct in applying October 1986 levels of "separations factors" [8] when calculating SWB's rate base, (5) severance pay expenses were correctly excluded from the determination of SWB's revenue requirements, (6) in calculating SWB's "cash working capital," Staff correctly excluded "local service revenue billed in advance" and (7) interest should not be charged against SWB's excess deferred income taxes.

In accordance with these findings the Commission ordered that (a) interest is to be applied to SWB's surplus cash (or revenue excess) at the annual rate of 11.589%, (b) the revenues generated by tax law changes should not be refunded to ratepayers but instead are to be used for upgrading service, *i.e.,* converting multi-party line areas to single-party service and modernizing central offices, (c) SWB must "file tariffs and rate schedules consistent with this order," implement the service improvement programs and rate reductions and submit a "private letter ruling request consistent with the purposes and findings set forth herein" and (d) "as a matter of policy" the depreciation reserve deficiency is to be amortized over a four-year period to provide "rate stability" for Oklahoma ratepayers.[9]

The State, AARP and SWB each seek corrective relief from various portions of the Commission's order. For the reasons to be stated we affirm in part, reverse in part and remand this cause for further proceedings.

## II.

## AARP HAS STANDING TO APPEAL

SWB argues that AARP lacks standing to seek corrective relief because it is not aggrieved by the Commission's order. We are told that the State, through the Attorney General's office, and the Commission's Staff sufficiently protect "AARP's interest ... to the same extent [that the interests of] ... other ratepayers [are protected]." SWB claims "[t]here is no distinct injury to AARP" and the Commission's order now before us "cannot possibly cause injury, because it not only confers a benefit on Oklahoma ratepayers by ordering expenditures of funds for service improvements, it actually reduces mileage

---

**8.** For the meaning of "separations" see *infra* note 39.

**9.** The Commission's order also requires Staff to (1) "investigate and determine the adequacy of Southwestern Bell Telephone Company's labor tracking mechanism in Cause No. PUD000662" and (2) "apply to the Commission for an order requiring production of any information which is not produced in a timely manner." SWB, in turn, must "assist the Staff in its investigation in Cause No. PUD000662 concerning the Yellow Pages." Because none of the parties in this appeal complains about any of these portions of the order, we leave them undisturbed.

charges and rates for MTS and WATS services."[10] We are not persuaded by these arguments. As SWB points out in its own brief, the terms of Art. 9 § 20, Okl. Const.,[11] explicitly provide that an appeal may be brought by "*any party affected*" or "*any person deeming himself aggrieved*"[12] by any action of the Commission affecting the rates of a public service corporation.[13] AARP qualifies as a "party affected" by the order now before us.

AARP's membership is composed of individuals who presumably are ratepayers. SWB does not contend to the contrary. Inasmuch as AARP, on behalf of its membership, had *unsuccessfully* pressed the Commission for a *refund* of SWB's surplus cash, AARP certainly may deem itself aggrieved or affected by the Commission's order, which impacts upon telephone service as well as rates.[14] AARP doubtless has standing to press for relief in this appeal.[15]

10. The Commission's order does call for the following rate reductions:

"The Commission finds that due to a lower revenue requirement, rate reductions are appropriate in certain categories of service as recommended by Staff witnesses Schroeder and Motley. The Commission finds that the rate design effecting a reduction in mileage charges and intraLATA MTS and WATS recommended by Staff is appropriate, especially because residential local exchange service is currently subsidized and priced substantially below cost and toll rates are priced substantially above costs.

"Therefore, the Commission finds that SWBT shall implement new tariffs immediately in accordance with the following schedule:

| | Total Annual Revenue Reduction |
|---|---|
| Mileage Charges | $6,380,000 |
| IntraLATA MTS and WATS | $1,467,172 |

"Mileage charges, currently paid by approximately 100,000 Oklahoma customers, shall be immediately reduced by 50 percent of SWBT's current tariffed rates. In addition, upon the conversion of a given central office (or exchange) to eliminate part-line service, flat rate mileage charges are to be applied as follows:

| | Monthly Rate |
|---|---|
| Within 1 mile of base rate area boundary | $ .77 |
| Outside of 1 mile from base rate area boundary | $3.85 |

"All customers affected by the upgrade from the multi-party to single-party service shall be notified by SWBT of any changes in their monthly local exchange rate including immediate conversion to the appropriate one-party rate and mileage charges, as a result of the upgrade."

11. The pertinent terms of Art. 9 § 20, Okl. Const., provide:

"*From any action of the Corporation Commission prescribing rates, charges, services, prac-* tices, rules or regulations of any public utility or public service corporation, or any individual, person, firm, corporation, receiver or trustee engaged in the public utility business, *an appeal may be taken by any party affected, or by any person deeming himself aggrieved by any such action,* or by the State, *directly to the Supreme Court of the State of Oklahoma,* in the manner and in the same time in which appeals may be taken to the Supreme Court from the District Courts, *except that such an appeal shall be of right,* and the Supreme Court may provide by rule for proceedings in the matter of appeals in any particular in which the existing rules of law are inapplicable. \* \* \*" (Emphasis added.)

12. The term "aggrieved party" includes one whose pecuniary interest in the subject matter is directly and injuriously affected by the decision from which the appeal is brought. *Cleary Petroleum Corp. v. Harrison,* Okl., 621 P.2d 528, 530 (1980).

13. A telephone company is a "transmission company," which, in turn, is a "public service corporation" within the meaning of Art. 9 § 34, Okl. Const., *infra. Southwestern Bell Tel. Co. v. State of Oklahoma,* 303 U.S. 206, 58 S.Ct. 528, 62 L.Ed. 751 (1938).

The pertinent terms of Art. 9 § 34, Okl. Const., provide:

"\* \* \* *The term 'public service corporation' shall include* all transportation and *transmission companies,* all gas, electric, heat, light and power companies...." (Emphasis added.)

14. See *Missouri–Kansas–Texas R. Co. v. State,* Okl., 712 P.2d 40, 44 (1985), where an aggrieved unincorporated association was held to have standing to appeal from an order of the Corporation Commission.

15. SWB had moved (1) to strike AARP's brief in response to SWB's cross appeal as "unauthorized" and (2) to bar AARP from addressing error included in its brief but omitted from its petition-in-error. Inasmuch as AARP has standing to seek corrective relief from the order

## III.

### A PUBLIC SERVICE CORPORATION'S SURPLUS CASH GENERATED SOLELY BY CHANGES IN INCOME TAX LAWS NEED NOT BE REFUNDED TO RATEPAYERS

■ SWB, a public service corporation,[16] undisputedly accumulated over $30 million in surplus funds, which are attributed solely to the federal income tax law change.[17] The State and AARP contend that this sum should be treated as an "overcharge" within the meaning of 17 O.S.1981 § 121 [18] and hence *refunded* to Oklahoma ratepayers. Although § 121 does expressly require that overcharges be refunded, the question is whether the surplus cash in controversy resulted from "charges ... in excess of the lawful rate." [19] We hold it did not.

The rates charged by SWB during the period in question (January 1, 1987 to September 30, 1989) clearly were authorized by the Commission. Inasmuch as SWB's ac-cumulation of surplus funds is attributed solely to a decrease in the federal corporate income tax rate, this money was *not* obtained by overcharging ratepayers. Neither may the Commission's finding regarding the federal tax law's effect upon SWB be regarded as a declaration that a different rate should have been charged. In short, § 121 affords *no* authority for requiring the refund sought by AARP and the State.

## IV.

### SWB IS ACCOUNTABLE FOR INTEREST ON THE SURPLUS CASH IN SUIT

■ SWB urges that the Commission erred in charging or holding it accountable for interest on the surplus cash generated by the decrease in the federal corporate income tax rate. We reject this contention. The briefs contain no authority which militates in favor of reversing the Commission's decision. It is beyond question that

---

tendered in this appeal, AARP certainly may respond to SWB's briefs. As for striking portions of AARP's brief, we treat AARP's petition-in-error as amended by brief. See Rule 1.17(a), Rules of Appellate Procedure in Civil Cases, 12 O.S.1981, Ch. 15, App. 2, *infra; Frazier v. Bryan Memorial Hosp. Authority,* Okl. 775 P.2d 281, 284 n. 12 (1989).

The pertinent terms of Rule 1.17(a) provide: *"The petition in error may be amended at any time before brief in chief is filed, or thereafter by leave of court,* to include any error or any issue presented to and resolved by the trial court which is supported by the record...." (Emphasis added.)

**16.** See *supra* note 13.

**17.** There is no question that the Tax Reform Act of 1986, *i.e.,* 26 U.S.C. § 11(b)(1)(C), *infra,* decreased the corporate income tax rate from 46% to 34%, effective July 1, 1987, and thereby caused SWB's accumulation of surplus revenue or cash. The terms of 26 U.S.C. § 11(b)(1)(C) provide:

"(a) Corporations in general.—A tax is hereby imposed for each taxable year on the taxable income of every corporation.

"(b) Amount of tax.—

(1) In general.—The amount of the tax imposed by subsection (a) shall be the sum of—
* * * * * *
(C) 34 percent of so much of the taxable income as exceeds $75,000.

In the case of a corporation which has taxable income in excess of $100,000 for any taxable year, the amount of tax determined under the preceding sentence for such taxable year shall be increased by the lesser of (i) 5 percent of such excess, or (ii) $11,750."

**18.** The terms of 17 O.S.1981 § 121 provide:

"The Corporation Commission is hereby vested with the power of a court of record to determine: First, *the amount of refund due in all cases where any public service corporation,* person, or firm, as defined by the Constitution, *charges an amount for any service rendered by such public service corporation,* person, or firm, *in excess of the lawful rate in force at the time such charge was made, or may thereafter by declared to be the legal rate which should have been applied to the service rendered;* and, second, *to whom the overcharge should be paid."* (Emphasis added.)

**19.** See 17 O.S.1981 § 121, *supra* note 18.

SWB had the use of the funds whose availability stands attributed to a tax law change alone and which came to SWB without consideration of its rate base.[20] "The presumption in the business world ... and [in] equity, is that the use of money normally calls for the payment of interest."[21] We find this rule to be applicable in this case.[22]

## V.

### SWB'S SURPLUS CASH MAY BE USED TO ELIMINATE MULTI–PARTY LINES IN THIS STATE

Having held that SWB need not refund its surplus cash to ratepayers, the next question to be answered is whether the Commission erred by directing SWB's use of those funds to upgrade telephone service. We answer in the negative.

The record leaves no doubt that the Commission viewed SWB's accumulation of surplus revenue as presenting a "unique opportunity to accomplish service and central office upgrades[23] in a manner which eliminates any adverse impact on basic exchange rates and any burden on ratepayers."[24] The Commission's decision in this regard was hence one of "policy,"[25] and this court is not free to disturb that ruling if it is supported by "substantial evidence."[26]

The Commission's efforts to replace multi-party lines with single-party connections are complemented by the "impossibility of identifying specific ratepayers" who would be entitled to a refund. Indeed, it would be inequitable to distribute funds based on some artificial formula that lacks a relation to the ratepayers' entitlement. In any event, there can be no doubt that the service improvements ordered by the Commission are *inherently beneficial* and supported by substantial evidence.[27] On this record we are not free to block the Com-

---

**20.** "Rate base" is the amount upon which the utility is permitted to make a profit; it is based upon the value of property "used and useful in the public service business at the time the inquiry was made." *Turpen v. Oklahoma Corp. Com'n*, Okl., 769 P.2d 1309, 1320 n. 25 (1989).

**21.** *In re Will of Kalicicki*, 33 Wis.2d 277, 147 N.W.2d 343, 348 (1967). See also *United Gas Improve. Co. v. Callery Properties, Inc.*, 382 U.S. 223, 230, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965), where the Court held that "the imposition of interest on refunds [paid by natural gas producers for charging excessive rates] *is not an inappropriate means of preventing unjust enrichment;" Phillips Petroleum Company v. Adams*, 513 F.2d 355, 368 (5th Cir.1975), where the court applied the equitable doctrine of unjust enrichment to require a pipeline company to pay interest on the principal sum it owed mineral interest owners and had held as "suspense money" pending a federal regulatory agency's decision.

**22.** We also note that our decision regarding interest on the surplus cash accumulated by SWB is consistent with the legislature's view that interest is chargeable on the amount due a customer who paid an excessive rate. See the amended version of 17 O.S.1981 § 121, found in Okl.Sess.L.1991, ch. 332 § 1, effective July 1, 1991, whose pertinent terms provide:

"The Corporation Commission is hereby vested with the power of a court of record to determine: First, *the amount of refund due and any interest owing upon such refund* in all cases where any public service corporation, person, or firm, as defined by the Constitution, charges an amount for any service rendered by such public service corporation, person, or firm, in excess of the lawful rate in force at the time such charge was made...." (Emphasis added.)

**23.** Part VI of this opinion deals with the Commission's approval to use part of SWB's surplus cash for central office improvements.

**24.** The quoted language is excerpted from the Commission's order.

**25.** The Commission's order further explains that "[o]ne of the most important goals espoused consistently over the years by this Commission has been the goal of universal service. Inherent in this goal is not only bringing affordable telephone service to the greatest number of people, but also providing the highest quality service available. This Commission has had a longstanding service improvement program, but due to financial constraints, it has not been possible to implement such a program in a relatively short time frame."

**26.** See *infra* note 30.

**27.** The Commission found that "[u]pgrading multi-party service to single-party service will directly benefit approximately 54,000 Oklahoma customers who now have multi-party service.

mission from pursuing its "goal of universal service by implementing [this improvement program]." [28]

## VI.

## THE DECISION TO UPGRADE CERTAIN CENTRAL OFFICES IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

■ The Commission approved the expenditure of a portion of SWB's surplus cash for upgrading fourteen "central offices" listed in one of Staff's exhibits.[29] The State and AARP contend that the decision to improve *these particular facilities* lacks evidentiary support. We agree.

None of the parties challenges the Commission's finding that "[c]entral [o]ffice upgrades will improve the quality of service ... and increase the level of technology available to customers...." Nor is there any clear denial that modernization is generally needed. The fatal weakness in the Commission's choice of facilities lies in *undisputed* testimony that Staff's "Project Priority List"—upon which the Commission relied—was presented as "simply a listing of projects that one might consider." Staff's list of priority upgrade projects dif-

fered from that of SWB. Moreover, a witness for Staff even understood that a separate hearing would be held to evaluate the central offices slated for upgrading. In light of these admissions, it is no wonder that the Commission's order contains no reference to any specific information that could provide a basis for upgrading the listed central offices.

The Commission's order regarding the upgrade of Staff's proposed list of central offices hence cannot be sustained. A hearing should be conducted on remand to determine specifically *which* central offices are most in need of improvement or modernization.

## VII.

## THE COMMISSION'S ENLARGEMENT OF ITS INQUIRY TO INCLUDE CONSIDERATION OF CHANGES IN SWB'S BUSINESS OPERATIONS IN THIS PROCEEDING DOES NOT CONSTITUTE REVERSIBLE ERROR

■ AARP complains that since the proceeding before the Commission had been initiated solely to inquire into the impact of the Tax Reform Act of 1986 upon Oklahoma public utilities, the Commission impermissibly expanded the scope of its probe when it allowed SWB to present evidence

---

The Commission notes that the public comments submitted to this Commission overwhelmingly favored the proposed upgrade programs. All ratepayers will benefit indirectly from these programs. As the Staff explained in its testimony, and as explained in the Report of the Hearing Officer, the capital improvement plan proposed by the Staff avoids the borrowing costs and other costs that would normally be associated with such an upgrade. Such borrowing costs would normally be permissible and recoverable by SWBT as costs of service. By avoiding such costs, rates are kept lower for all Oklahoma ratepayers." *None of these findings is challenged in the briefs.*

**28.** The Commission found that $30,677,167 of SWB's surplus revenue should be applied as follows:

"I. Party Line Elimination Program

| | |
|---|---|
| Capital Cost | $13.3 million |
| Conversion Expense | 4.9 million |
| Total Cost | $18.2 million |

"II. The remaining balance plus interest accruing from the date of this order shall be invested in central office service upgrades.

"The Party Line Elimination Program shall begin immediately. Staff shall monitor the progress and the costs of the Program, and SWBT shall submit quarterly reports to Staff as to the progress and costs expended until completion of the Program. SWBT shall also perform any necessary conversion of modifiable customer telephone sets. Customers shall not be charged for the costs of modifications. Such costs shall be included in the cost of the upgrade programs. The Commission directs the Company to file appropriate tariffs to accomplish this party line elimination program."

**29.** A "central office" is "[a] switching unit, in a telephone system which provides service to the general public, having the necessary equipment and operations arrangements for terminating and interconnecting subscriber lines and trunks or trunks only. There may be more than one central office in a building." 47 C.F.R. Part 36, App. at 581.

of changes in its business operations. We disagree. The error urged here was not accompanied by a showing that AARP had been prejudiced by the inquiry's expansion. AARP makes no showing of this kind.

AARP urges that the Commission erred by failing to disregard "known and measurable changes in SWB's business operations." Had SWB's accumulation of surplus cash not been attributable to a tax law change but instead was caused by some other factor, i.e., a significant drop in the price of "energy", SWB would still benefit from the surplus. Under those circumstances as well as under the facts in this case it would *be inherently unfair for the Commission to consider the surplus income in total separation or isolation of other utility needs.*

In any event AARP has failed to show that the issues joined by SWB are *not* intertwined with the other elements which bear upon the rate structure. The scope of the Commission's inquiry was sound from legal, accounting and economic points of view. We hence conclude that the Commission did not abuse its discretion by considering evidence of changes in SWB's business operations in conjunction with its inquiry's original stated purpose.

## VIII.

### THE COMMISSION'S FINDING OF A DEPRECIATION RESERVE DEFICIENCY LACKS SUBSTANTIAL EVIDENTIARY SUPPORT

The State's prime contention in this appeal, which is also included in AARP's assignments of error, is that the Commission's finding of a deficiency in SWB's depreciation reserve not only lacks any foundation in substantial evidence but also is unsupported by *any* evidence at all.[30] Among the "known and measurable changes" pertaining to business operations, the Commission considered SWB's depreciation reserve and found that a deficiency exists in the amount of $180 million. For the reasons to be stated, we reverse this portion of the Commission's order.[31]

"Depreciation reserve" refers to

"an accounting technique whereby a fund is built up from annual contributions, as an item of expense of operation, over a period of time representing the service life of a public utility plant to offset and to equal in value the ultimate total loss through use of the utility property so that at the end of such service life the depreciation reserve fund will replace the property so worn out by the various factors of depreciation." [32] (Citation omitted.)

A deficiency in the depreciation reserve is hence generated when the useful life of the property is unexpectedly reduced. In the words of the Commission a depreciation reserve deficiency "arises when depreciation rates previously established for plant and equipment become inadequate due to technological or physical obsolescence of the plant and equipment." In the scheme of rate structure, depreciation is an allowance given to SWB, *i.e.,* an operating ex-

---

**30.** Decisions by the Corporation Commission may be vacated if they lack the support of "substantial evidence." See Art. 9 § 20, Okl. Const., whose pertinent terms provide:

"* * * *

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving [an] ... asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. *In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine* whether the Commission has regu-

larly pursued its authority, and *whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.*" (Emphasis added.)

**31.** The State and AARP also contend that the Commission abused its discretion by treating the depreciation reserve deficiency as a debt and amortizing it over a four-year period. Because we reverse the Commission's finding that such a deficiency exists, we need not address the amortization issue.

**32.** *Off. of Consumers' Counsel v. P.U.C. of Ohio,* 6 Ohio St.3d 405, 453 N.E.2d 584, 585–586 (1983).

pense,[33] by which the cost of an investment may be recovered through the rates charged.

If, for example, the useful life of an item of equipment had initially been predicted to be 10 years, but its life expectancy is later found to be no more than 6 years, then the rate base would be reduced faster than initially planned. The result is an increase in current operating expenses, which could warrant an increase in rates charged to customers. As an asset depreciates over time in accordance with a schedule (*or rate*) that is based on an estimate of the asset's useful life, the rate base is reduced. A reduced rate base, in turn, means a decreased return on the investment. In short, when equipment becomes either less useful or obsolete, the schedule of depreciation becomes inadequate. This, in turn, gives rise to a deficiency in depreciation reserve. The question for us to resolve here is whether the Commission's finding that SWB has a depreciation reserve deficiency is supported by substantial evidence. This we answer in the negative.

The record reveals, and there is no question, that the Commission's reserve deficiency finding is based upon the testimony of a single Staff witness. According to the Commission's order, "[t]he amount of the depreciation reserve deficiency *was established for SWB at the 1986 Three-Way Meeting* wherein SWBT, Commission Staff and the FCC [Federal Communications Commission] staff met together for the purpose of *discussing* depreciation rates for SWBT." (Emphasis added.) Staff's witness "fully participated in this three-way process ... [where] *Staff* reviewed the depreciation rates for each account and the reserve imbalance *which the FCC had verified to exist* through the use of computer programs which analyzed data supplied by SWB. Staff's calculations took into ac-

count a total state reserve deficiency of $180 million." (Emphasis added.) So noted the Commission.

As a result of this meeting *the FCC* determined that a depreciation reserve deficiency exists. Although the Commission may have, in SWB's words, "made its own independent decision" regarding reserve deficiency, we conclude that the ruling at hand consists of no more than a decision *to agree with the FCC's determination that a deficiency exists.*

SWB admits in its brief that "Staff [had] recommended to the Commission the depreciation reserve deficiency amount only after being furnished with and reviewing capacious records related to SWBT in Oklahoma. This process included presentation of voluminous depreciation data (binders) *to the FCC ....*" (Emphasis added.) Although SWB relies heavily upon the notion that this evidence is undisputed, *none of this data was tendered for the Commission's own consideration.* It is also undisputed that the Commission relied upon *its Staff's participation* in the Three-Way Meeting and that its Staff had *there* relied upon *the FCC's assessment* of data and records *which SWB had voluntarily supplied.* In addition, the Commission approvingly observed in its order that *"[S]taff* had the opportunity to review the audit *conducted by the FCC* and was satisfied concerning its accuracy."[34] (Emphasis added.)

 Staff urges that its witness provided expert testimony upon which the Commission could rely in making its factual determination that a depreciation reserve deficiency exists. We reject the notion that there is an "evidentiary" foundation upon which the Commission's finding is grounded, since it considered no specific data or documentation that could satisfy the "sub-

---

**33.** *Turpen v. Oklahoma Corp. Com'n, supra* note 20 at 1316 n. 7.

**34.** Staff and SWB had stipulated early in the proceeding that an audit was necessary. Yet rather than take steps to inspect SWB's records,

Staff, and eventually the hearing officer and the Commission, all relied upon the FCC's findings, which were derived from data that SWB voluntarily produced *for the FCC's consideration* at the Three-Way Meeting.

stantial evidence" standard.[35]

■ The evidence upon which the Commission based its finding consists of expert testimony about data *dehors the record.* This is no substitute for the *Commission's own assessment of evidence before it.* Indeed, not even the common law's "summary rule," now codified in 12 O.S.1981 § 3006,[36] can cure this defect in proof. The summary rule permits an expert to summarize a mass of data and reports before the court. Testimony of this nature is admissible even though its basis, *i.e.,* the mass of materials, has not been admitted into evidence.[37]

Had the summary rule been invoked by the evidence's proponents, *the raw data's availability would have been required for inspection by the opposing party.* Without question the raw data upon which the witness relied here was neither tendered nor made available otherwise in the course of proceedings before the Commission.[38] In short, because the summary rule's sound application presupposes the existence of an underlying pool of raw data before the tribunal and hence available for examination during the proceeding—and nothing less will suffice—it affords no safety net for the Commission's finding.[39]

■ *Nor* do the terms of 75 O.S.1981 § 310(4)[40] dispense with the need for either the Commission's own assessment of data or the latter's availability at the proceeding. Section 310(4) provides that "notice may be taken of generally recognized technical or scientific facts within the agency's

---

**35.** "Substantial evidence" possesses substance and is consequential; it denotes "fitness to induce conviction." *Pannell v. Farmers Union Cooperative Gin Ass'n,* 192 Okl. 652, 138 P.2d 817, 818–819 (1943); *Turpen v. Oklahoma Corp. Com'n, supra* note 20 at 1317.

**36.** The terms of 12 O.S.1981 § 3006 provide: "The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, *summary or calculation.* The originals, or duplicates, *shall be made available for examination or copying, or both, by other parties at a reasonable time and place.* The judge may order that they be produced in court." (Emphasis added.)

**37.** *Suttle v. Chadwell,* 196 Okl. 298, 164 P.2d 880, 882 (1946) (the court's syllabus ¶ 5).

**38.** See *State v. Southwestern Bell Tel. Co.,* Okl., 662 P.2d 675, 681 (1983), where this court held that *"due process* and the requirement of full hearing do[es] not preclude … a fact finding agency [from considering] … evidence and conclusions reached in proceedings not conducted in the personal presence of the [agency's] members … *provided that the individual members of the fact finding agency … making [the] … determination … consider[s] and appraise[s] the evidence which justified the conclusions reached by the fact finder made outside the presence of the determining body."* (Emphasis added.) There is no dispute in the instant case that the Commission considered *none* of the specific information that had been before the FCC.

**39.** In this appeal SWB also urges that the Commission arbitrarily, and hence erroneously, "froze"—at the October 1986 levels—the separations factors *applicable to depreciation reserve deficiency alone.* The term "separations" describes "[t]he process by which telecommunications property costs, revenues, expenses, taxes and reserves are apportioned … [between state and interstate business]." 47 C.F.R. Part 36, App. at 585; 47 C.F.R. § 36.1(b). *Because today we reverse the Commission's finding that a depreciation reserve deficiency exists, we need not consider SWB's quest for corrective relief regarding separations factors.* Indeed, we should withhold our review of the formula applied by the Commission for allocating depreciation reserve deficiency, if any does exist between state and interstate facilities. By the time a hearing on remand is conducted there may be new separations standards to apply. *This court will not anticipate the existence of a fact; nor will it forecast an appellate response to a fact not yet of record.*

**40.** The terms of 75 O.S.1981 § 310(4) provide: "(4) Notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties *shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed.* The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence." (Emphasis added.)

specialized knowledge." Although the terms of this section of the Administrative Procedures Act, 75 O.S.Supp.1990 § 250 *et seq.*, do not apply to the Commission,[41] the minimum standards of due process embodied in § 310(4) nonetheless do.[42] In any event, the record does not indicate the Commission, however informally, took "notice" of the FCC's findings and invited the opposing parties to meet the extra-record material by rebuttal. Rather, the Commission simply *adopted* a mass of proof without the benefit of a proper predicate. Moreover, the extra-record "facts" described by the testimony as supportive of the depreciation reserve deficiency finding would not necessarily qualify as "generally recognized technical facts."

### IX.

**THE COMMISSION SHOULD HAVE CONSIDERED SWB'S SEVERANCE PAY EXPENSES**

■ Among the factors SWB pressed for consideration by the Commission was severance pay expense. Although Staff had earlier agreed with SWB that $4.7 million is an appropriate sum to be included in calculating the utility's revenue requirement, Staff nevertheless excluded it from their proposal. The Commission also chose to disallow SWB's severance pay expense. On this point we reverse.

According to the Commission's order, Staff's treatment of severance pay was correct *"because Staff was unable to verify annualized wage levels* due to the methodology that SWBT uses to track its Oklahoma labor costs." (Emphasis added.)

This explanation, though uncontroverted, leaves us with no doubt that the Commission's decision in this regard is arbitrary and hence cannot be sustained.

The basis for disallowing severance pay expense is not questioned by any party. The State, AARP and Staff all agree that SWB either failed or was unable to supply Staff with a "labor-tracking mechanism," that is, audit information for allocating wage and non-wage data between state and interstate jurisdictions. While SWB does not deny this, none of its opponents has offered any explanation as to how an allowance for severance pay expenses is dependent upon a labor-tracking audit. Neither have we been offered a reason to doubt SWB's assertion that

"the breakdown of each regulatory account between wage and non-wage data does *not* mean that SWBT has non-verifiable or non-auditable severance pay expenses. Total payroll expenses for Oklahoma employees, and total severance pay expenses are easily audited, and were verified by Staff. The verifiability of these expenses does not depend on being able to go to the regulatory account for maintenance expenses, for example, and break down that account between wage and non-wage data. That type of breakdown has nothing to do with the keeping of records relating to severance pay, which Staff in fact audited."

SWB's failure or refusal to produce records, data or other information can make it subject to the Commission's contempt or other coercive powers.[43] These circumstances are no substitute for having

---

**41.** See 75 O.S.Supp.1990 § 250.4(B)(4), whose terms provide:

"B. As specified, the following agencies or classes of agency activities are not required to comply with the provisions of Article II of the Administrative Procedures Act [75 O.S.Supp. 1990 § 309 *et seq.*]:
" * * *
"4. The Oklahoma Corporation Commission;
* * *"

**42.** See *Teleco, Inc. v. Corporation Com'n*, Okl., 653 P.2d 209, 214 (1982); *C.F. Braun & Co. v.*

*Corporation Commission*, Okl., 609 P.2d 1268, 1273–1274 (1980).

**43.** See Art. 9 § 19, Okl. Const., *infra*; 17 O.S. 1981 §§ 2 and 153, *infra*.
The pertinent terms of Art. 9 § 19, Okl. Const., provide:
"*In all matters* pertaining to the public visitation, regulation, or control of corporations, and *within the jurisdiction of the Commission, it shall have the powers and authority of a court of record, to administer oaths, to compel the attendance of witnesses, and the produc-*

substantial evidence in support of an order. The Commission's disallowance of SWB's severance pay expense must hence be disapproved on the present record, subject to further consideration on remand.

## X.

## THE COMMISSION MISCALCULATED SWB'S CASH WORKING CAPITAL

■ The next issue involves the Commission's computation of SWB's "cash working capital" requirement. Cash working capital refers to the amount of cash needed from the utility's own funds to meet current obligations as they arise during the lag period between services rendered and collection of revenues.[44] Using a "modified formula approach" the Commission found that SWB had a *negative* cash working capital requirement, which indicates the utility needs no cash to sustain its operations between the time services are rendered and the time payment for them is received. SWB contends the opposite—that it has a *positive* cash working capital requirement and hence needs cash during this period. SWB claims that its conclusion is based upon the Commission's own "modified formula approach," while

the State, AARP and Staff maintain that it is based upon a flawed "lead-lag" study.[45] SWB submits that the only reason it offered the lead-lag study was because its availability was mandated by the Commission during SWB's previous rate-making case.

According to SWB, the Commission's calculations are flawed because Staff based its approach on an "instant receipt" assumption—namely that revenues are received on the date of billing. We are told this assumption is erroneous because (1) bills are not mailed to customers until one week after the billing date and (2) there is a lag period of approximately twenty-five days from the date of the bill to the date of payment.

While it is not clear from the record whether Staff actually used the "instant receipt" assumption in its calculations, Staff's approach at least appears to lack a basis in substantial evidence. SWB does not challenge Staff's use of the "modified formula approach," though the Commission did fail to specify the particular factors it employed. Neither did it state whether it considered the lag in rendition of services and receipt of payment therefor. Moreover, the briefs direct us to no evidence of

---

*tion of papers, to punish for contempt any person guilty of disrespectful or disorderly conduct* in the presence of the Commission while in session, *and to enforce compliance with any of its lawful orders or requirements . . . ."* (Emphasis added.)

The pertinent terms of 17 O.S.1981 § 2 provide: *"In case of failure of any corporation,* person or firm *to obey or comply with any order or requirement of the Corporation Commission, the Commission may punish* such corporation, person or firm, as *for contempt.* Such contempt proceedings may be instituted by any citizen of this state, or other parties affected by such order, by filing an affidavit with the Corporation Commission, setting forth the acts of omission or failure to comply with such order or requirement. * * * " (Emphasis added.)

The terms of 17 O.S.1981 § 153 are: "In addition to the powers enumerated, specified, mentioned or indicated in this act, *the Commission shall have all additional implied and incidental powers* which may be proper and necessary to carry out, perform and execute all powers herein enumerated, specified,

mentioned, or indicated, and *to punish as for contempt such corporation,* association, company or individual, their trustees, lessees, receivers, successors and assigns, *for the disobedience of its orders in the manner provided for punishment of* transportation and *transmission companies* by the Constitution and laws of this state." (Emphasis added.)

**44.** *Boise Water Corp. v. Idaho Public Util. Commission,* 97 Idaho 832, 555 P.2d 163, 166 (1976); *City of Pittsburgh v. Pennsylvania Public Util. Com'n,* 370 Pa. 305, 88 A.2d 59, 61 (1952); *Southern New England Tel. Co. v. Public Util. Com'n,* 29 Conn.Supp. 253, 282 A.2d 915, 921 (1970); *Anaheim, Riverside, etc. v. Fed. Energy Reg. Com'n,* 669 F.2d 799, 805 (D.C.Cir.1981).

**45.** "A lead-lag study divides the total adjusted operating expenses for the test year by the number of days in the year to arrive at an average daily expense requirement. That figure is then multiplied by the average resale class revenue lag time (in days) to yield an actual working cash requirement." *Anaheim, Riverside, etc. v. Fed. Energy Reg. Com'n, supra* note 44 at 805.

how Staff's calculations resulted in a negative cash working requirement, while SWB, using the same "modified formula approach," arrived at a positive cash working capital requirement. Because the Commission's determination of SWB's cash working capital requirement is not sustained by substantial evidence, we disapprove of this part of its order and remand the issue to the Commission for further consideration.

## XI.

### THE COMMISSION'S DECISION NOT TO CONSIDER INTEREST ON SWB'S EXCESS DEFERRED INCOME TAXES WILL NOT BE DISTURBED

■ The State and AARP contend that the Commission erred by failing to charge interest on SWB's excess deferred income taxes. Because the briefs fail to provide us with a record-supported argument that would defeat the basis for the Commission's decision, we must affirm.

The hearing officer's report explains that "[e]xcess deferred income taxes are the result of timing differences between tax expenses charged for books and taxes payable to the state and federal governments. Any differences are accumulated in the deferred income tax balance and are deducted from rate base until the taxes are actually paid to the government."

Here, SWB collected from the ratepayers sums sufficient to satisfy the 46% income

tax rate but paid taxes for 1987 at 40% and at 34% in 1988 and the prospective year. An excess is thus created because the deferred tax balance became greater than the amount of taxes actually paid. The Commission decided that it would not be appropriate in this case to charge interest for SWB's excess deferred income taxes. This is so because ratepayers are benefited when the excess is deducted from the rate base, thus lowering the revenue requirement. According to the hearing officer's report, charging this interest would result in a substantial revenue deficiency, and consequently, the need to raise telephone rates.[46]

The AARP contends that this decision is erroneous because, in their view, "[i]f the Commission would immediately refund to the ratepayers who paid the deferred income taxes, these ratepayers could immediately deposit the money in the bank and draw interest on it."[47] The AARP also contends that there is no substantial evidence the ratepayers will receive any benefit by SWB's retention of the excess deferred income taxes, as the Commission has permitted.[48]

Every finding of the Corporation Commission made in matters it frequently adjudicates and in which it possesses expertise is accompanied by a presumption of correctness if supported by substantial evidence.[49] Although AARP did present ex-

---

**46.** The evidence upon which the Commission relied includes testimony from the following witness as summarized in the hearing officer's report:

"[Shirley Norman:] Even though the unprotected excess deferred income taxes are proposed to be flowed back to the ratepayers over two years, and the unprotected excess deferred income taxes are to be flowed back pursuant to ARAM, *all of the excess deferred income taxes will eventually be flowed back to the ratepayers. If Staff hadn't reduced SWB's rate base by the amount of excess deferred income taxes, there would have been a very large revenue deficiency in each of the three test periods used in this case.* The 1987 revenue deficiency would have been $38.4 million, the 1988 revenue deficiency would have been

$22.8 million, and the prospective revenue deficiency would have been $28.7 million. However, *by reducing SWB's rate base by the $63.2 million excess deferred income taxes amount, a revenue excess for each of the three test periods results."* (Emphasis added.)

**47.** The quoted text is excerpted from AARP's brief.

**48.** The State does not join in AARP's complaint regarding interest on excess deferred income taxes.

**49.** *Teleco, Inc. v. Corporation Com'n, supra* note 42 at 212; *Turpen v. Oklahoma Corp. Com'n, supra* note 20 at 1317.

pert testimony favoring its position,[50] the Commission's decision is nonetheless supported by substantial evidence. Moreover, upon this point AARP's brief offers no clear basis for overcoming the law's presumption of correctness that attaches to the Commission's decision. We hence leave that part of the order undisturbed.

AFFIRMED IN PART AND REVERSED IN PART; CAUSE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS PRONOUNCEMENT.

LAVENDER, SIMMS, DOOLIN, HARGRAVE and ALMA WILSON, JJ., concur.

KAUGER and SUMMERS, JJ., concur in result.

HODGES, V.C.J., disqualified.

---

**50.** According to one of AARP's witnesses, Joseph William Mihuc, whose testimony is summarized in the hearing officer's report,

"interest should accumulate on the excess deferred income taxes to compensate the ratepayers for advancing payment to pay the taxes. All taxes collected from the ratepayers, but not currently refunded, should continue to accumulate interest until refunded. The

excess deferred income taxes should be deducted from SWB's rate base and amortized and returned to the ratepayers along with interest at SWB's authorized rate of return, 11.85%.

"The flow back of unprotected excess deferred income taxes should be made to the ratepayers in the form of a cash refund as soon as possible."